[Cite as *State v. Quinn*, 2018-Ohio-5279.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-102 |
| | : | |
| v. | : | Trial Court Case No. 2013-CR-869 |
| | : | |
| JAMES E. QUINN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of December, 2018.

. . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Clark County Prosecutor's Office, Appellate Division, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

JAMES E. QUINN, #699-607, P.O. Box 69, London, OH 43140
        Defendant-Appellant, Pro Se

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} James E. Quinn appeals from a judgment of the Clark County Common Pleas Court that denied his second motion for a new trial. The judgment of the trial court will be affirmed.

### Factual Background and Procedural History

{¶ 2} In March 2014, a Clark County jury found Quinn guilty of two counts of domestic violence, two counts of kidnapping, one count of abduction, and one count of intimidation. After merging the kidnapping and abduction charges, the trial court sentenced Quinn to an aggregate sentence of 20 years in prison.

*a. Quinn I*

{¶ 3} On Quinn's direct appeal, this court affirmed the trial court's judgment. *State v. Quinn*, 2016-Ohio-139, 57 N.E.3d 379, ¶ 66 (2d Dist.) ("*Quinn I*"). At that time, we summarized the facts underlying Quinn's conviction as follows:

The victim, Beverl[e]y Quinn,[1] is a 79-year-old woman, the mother of two daughters and two sons, including the defendant, James Quinn. In December 2013, Quinn's girlfriend, Samantha Ferrell, was living with Quinn's mother, Beverl[e]y, in her two-bedroom house. At that time, Quinn was under indictment for a domestic violence incident involving his mother; as a condition of bond he was subject to a no-contact order with his mother. Late in the evening, Beverl[e]y was awakened by noise, and found Quinn

---

[1] Our previous decisions employed the "Beverly" spelling reflected in the transcript of the complainant's trial testimony. However, as all documents signed by the complainant in regard to Quinn's current appeal spell her first name "Beverl**e**y," we have adopted the latter spelling for purposes of this decision.

and Ferrell in her home, drinking vodka and watching television. Beverl[e]y told Quinn he was not allowed to be there and asked Quinn to leave, to turn off the television, and for Samantha to go to her room. Quinn became very angry with his mother, pushed her into a chair, and hit her. When Quinn suggested to Samantha that they take his mother to "mental health," Samantha suggested that they take Beverl[e]y out into the country and dump her. Beverl[e]y then ran to her own bedroom, locked the door, and left the house by crawling out of the bedroom window. Beverl[e]y went to a neighbor's house and called the police. During the 911 call, Quinn identifie[d] her son, James Quinn, as the person who * * * abused her, and state[d] that Quinn left her house driving a white station wagon. Quinn and Samantha left Beverl[e]y's house before the police arrived. The police took photos of Beverl[e]y's bruises, and allowed her to return to her own home after they verified it was empty and secured. One of the two officers who spoke with Beverl[e]y at this time testified that Beverl[e]y was very articulate and said it was her son who had struck her in the face. No charges were filed against Quinn at this time.

According to Beverl[e]y's testimony at trial, several hours later Quinn returned to his mother's home, without Samantha, forced entrance into his mother's bedroom, and forced his mother to leave the house with him, threatening to take her to the country and make her jump off a bridge. Beverl[e]y described her son as very angry and intoxicated on alcohol and drugs. Beverl[e]y left with her son because she felt she had no choice. He

drove out into the country, stopped at a bridge and said, "if you don't jump, I'll push you." According to Beverl[e]y, Quinn decided he could not do it, and told her that he wouldn't do anything to her as long as she did not testify against him. Beverl[e]y testified at trial that Quinn then drove to Walmart, hitting her in the head numerous times as he was driving. After he left the car, Beverl[e]y got out of the car and approached a Walmart employee for help. She told the employee that her son had hurt her and was trying to kill her. The Walmart employee verified this course of events and testified that Beverl[e]y was scared, but she knew who she was, where she was, and was not disoriented or confused. The Walmart employee testified that as Beverl[e]y was talking to him, a man came up to both of them, grabbed Beverl[e]y's arm and complained that she was trying to hurt him. The employee insisted that he let go and leave her alone. A surveillance video of the Walmart parking lot corroborates this testimony, but is taken from too far a distance to identify the man's facial features. The surveillance video shows that Beverl[e]y approached the employee, a man approached them, and then the unidentified man left in a white station wagon. The employee could not identify Quinn as the person he saw and talked with in the parking lot. Beverl[e]y testified at trial that Quinn was driving her car, which she described as a tan sedan, not a white station wagon. No witness identified Quinn as the man depicted in the video in the Walmart parking lot.

The detective who interviewed Beverl[e]y at Walmart testified that Beverl[e]y identified her son, James Quinn, as the person who attacked her

in her home, who forced her into a car, threatened to harm her, and hit her face, causing visible injuries. The detective also testified that during his interview on the scene, Beverl[e]y was very emotional, but lucid and articulate about the events of the evening. Based on this interview, the detective obtained a search warrant. A search of Beverl[e]y's home revealed evidence that her bedroom door had been damaged as the result of being forced open.

Beverl[e]y was transported to the hospital by ambulance and treated in the Emergency Room at Springfield Regional Medical Center. The paramedic who transported Beverl[e]y testified that she was alert and oriented. The ER Nurse testified that Beverl[e]y was oriented, and did not appear to suffer from dementia or any other mental defect. The ER Nurse testified that Beverl[e]y identified her son as the person who had hit and injured her.

*Id.* at ¶ 3-6.

b. Quinn II

{¶ 4} Four months after his conviction, Quinn filed a motion for a new trial based on newly discovered evidence. On the same day we ruled on Quinn's direct appeal, this court also affirmed the trial court's denial of that motion. *State v. Quinn*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, ¶ 1 ("*Quinn II*"). That decision related the following relevant facts:

Four months after the trial and conviction, Quinn filed a motion for a new trial and attached three affidavits[:] his own affidavit and two affidavits from

his mother, Beverl[e]y, who recanted her trial testimony. The motion also requested a hearing. In the affidavits filed in support of the motion for a new trial, Beverl[e]y avers that her testimony was based on what she was told by her family and by the prosecutor. She avers that at the time of the incident, she was not wearing her glasses or hearing aid, and she was on medication that caused her confusion. She avers that she does not believe that Quinn committed the crimes against her, because she knows he had consumed two fifths of vodka and was too drunk to stand or drive on the night of the incident.

*Id.* at ¶ 10.

{¶ 5} In *Quinn II*, we noted that the trial court overruled Quinn's motion for a new trial without conducting a hearing, citing its impression that the Walmart surveillance video substantiated Beverley's testimony such that the new evidence did not raise "any probability" of a different trial result. *Id.* Although we disagreed with the trial court's conclusion that "evidence of Quinn's guilt was independently established," *see id.* at ¶ 18, we nonetheless determined that the record "contain[ed] sufficient support for finding that Beverl[e]y's testimony at trial was more credible than her post-trial affidavits." *Id.* at ¶ 19. We then elaborated:

At trial, evidence was presented from the officers who investigated the two separate incidents and the ER Nurse who talked with Beverl[e]y after she left Walmart. One officer testified that Beverl[e]y identified her son as the person who attacked her in her home. A detective testified that Beverl[e]y identified her son as the person who forced her into a car, threatened to

harm her, and hit her face, causing visible injuries. The Walmart employee also testified that Beverl[e]y told him that her son was trying to hurt her. Although hearsay, these witnesses' testimony was properly admitted as an excited utterance, an exception to the hearsay rule under Evid. R. 803(2). In ruling on the motion for a new trial, the trial court should have considered whether the testimony of the officers, the Walmart employee, and the nurse was sufficient to support the credibility of the victim's excited utterances at the time of the offenses, even if the victim later recanted her testimony. The trial court should have also considered the testimony of the investigating officers, the Walmart employee and the medical professionals, who all testified that although Beverl[e]y was scared, she was lucid, articulate and not confused or disoriented at the time she described details of the events that had just happened to her. The mental, emotional and physical condition of [ ] Beverl[e]y's state of mind at the time she made statements to the officers and medical professionals was properly admissible under Evid. R. 803(3).

*Id.*

{¶ 6} Applying the factors used to assess the credibility of affidavits, as set forth in *State v. Calhoun,* 86 Ohio St.3d 279, 285, 714 N.E.2d 905 (1999), we determined that "the *Calhoun* factors justify a conclusion that the affidavits filed in support of the motion for a new trial lacked credibility." *Id.* at ¶ 21. We explained:

The trial judge who presided over the trial is the same judge who reviewed the affidavit and determined its lack of credibility. In their post-trial affidavits,

both Quinn and his mother describe his level of intoxication on the night of the offenses as "too drunk to stand." Beverl[e]y's statements regarding how much Quinn had to drink and his ability to drive on the night of the incident, if believed, had to be based on hearsay statements Quinn made to her. She also claims that her original story was derived from fear based on hearsay statements made to her by family and the prosecutor. However, the trial testimony of the officers, the Walmart employee, and the ER Nurse confirmed that the story Beverl[e]y told at trial was consistent with the statements she made to them on the night of the incident, before she talked to her other family members or the prosecutor. The affidavits were signed by Quinn's mother, who may naturally want to protect her son from long-term incarceration. Quinn's new claim that Beverl[e]y was confused is not supported by the investigating officers or the medical professionals, who all found her oriented and articulate. Quinn's new claim that Beverl[e]y did not hear her son's voice on the night of the incident is directly contradicted by her trial testimony that he took her to a bridge and told her to jump, then said he would not hurt her if she did not testify against him. Based on the lack of Beverl[e]y's credibility in her affidavits, and the strength of her credibility at trial, as supported by the testimony of numerous witnesses, we conclude that even if the jury was presented with the new evidence there is not a strong probability that the outcome would be different.

*Id.*

**{¶ 7}** For those reasons, we held that the trial court did not err in overruling Quinn's

motion for a new trial without conducting a hearing. *Id.* at ¶ 22.

c. *Quinn III*

{¶ 8} In May 2016, this court granted Quinn's motion to reopen his direct appeal to raise a claim that the trial court erred in ruling on challenges during voir dire. One of those challenges was to Prospective Juror #11, a deputy with the Clark County Sheriff's Department whom Quinn urged the State "knew, or should have known[,] * * * was involved in this case." *State v. Quinn*, 2017-Ohio-7000, 95 N.E.3d 664, ¶ 13 (2d Dist.) ("*Quinn III*"). We overruled Quinn's assignment of error on that issue, *id.* at ¶ 14, and again affirmed the trial court's judgment. *Id.* at ¶ 19.

d. *Quinn IV*

{¶ 9} In February 2015, Quinn filed a petition for postconviction relief in the trial court, asserting nine claims. In August 2016, he moved to amend his petition to add additional claims and exhibits. When the trial court denied Quinn's motion for postconviction relief, Quinn once again appealed to this court. *See State v. Quinn*, 2017-Ohio-8107, 98 N.E.3d 1184 (2d Dist.) ("*Quinn IV*").

{¶ 10} In *Quinn IV*, we overruled all ten assignments of error Quinn raised at that time. *See id.* We first determined that the trial court did not err by failing to address Quinn's proposed amendments filed without leave of court 18 months after he filed the original petition. *Id.* at ¶ 25. We further determined that although the trial court did not address each of the original petition's assignments of error individually, that court's findings of facts and conclusions of law sufficiently apprised Quinn that he had "failed to set forth sufficient operative facts to establish substantive grounds for relief due to Beverl[e]y's credibility at trial." *Id.* at ¶ 30. Finally, as to the original petition's remaining assignments

of error, we determined that none warranted relief, as most were based on information contained in the amended petition not properly before the trial court, and the rest were barred by res judicata or were not supported by legally cognizable affidavits. *Id.* at ¶ 31-37.

> e.  Quinn V

{¶ 11} Now before us is Quinn's appeal from the trial court's denial of his second motion for a new trial. In that motion filed on August 3, 2016, Quinn identified 14 issues alleged to warrant relief under Crim.R. 33. Twelve of those issues related to the State's alleged failure to disclose, or destruction of, evidence that purportedly was exculpatory in nature or could have been used to impeach witnesses who testified against Quinn. The two remaining issues related to Quinn's trial counsel's alleged ineffectiveness due to failing to properly investigate his case, and to police performing a warrantless search of Beverley's home. Attached to the motion were 20[2] exhibits, including seven exhibits that purport to be copies of documents that the State was alleged to have failed to disclose through discovery (Trial Court Docket #79, Exhs. 1, 4, 5, 6, 7, 10, 13), five exhibits that purport to be affidavits or signed statements of Beverley Quinn (*id.*, Exhs. 2, 9, 11, 17, 21), four exhibits that purport to be affidavits of other individuals with information beneficial to Quinn's defense (*id.*, Exhs. 3, 12, 15, 16), and four exhibits that are copies of trial court filings or other documents related to this case that are alleged to support Quinn's motion. (*Id.*, Exhs. 8, 14, 18, 19.)

{¶ 12} On August 8, 2016, Quinn moved to amend his motion in order to add a

---

[2] Although the final exhibit is labeled "Exhibit Twenty-one," no Exh. 20 is attached to Quinn's motion as it appears in the record before this Court.

copy of the trial court's docket from his case as an exhibit. (Trial Court Docket #81, Exh. 22.) On October 23, 2017, Quinn also moved to supplement his motion with three additional affidavits. (Trial Court Docket #89, attached 8/1/17 Affidavit of Beverley Quinn; 3/24/16 Affidavit of Mike Simms; 8/3/17 Affidavit of Mark Rafferty.)

{¶ 13} On November 30, 2017, the trial court entered judgment against Quinn by entry stating in its entirety as follows:

Defendant's motion of August 3, 2016 for a new trial is OVERRULED.

Defendant's motion of October 23, 2017, for leave to supplement his motion

for a new trial is SUSTAINED.

(Emphasis sic.) (Trial Court Docket #90.)

{¶ 14} Although the terse nature of that ruling leaves its intent somewhat unclear, we interpret the judgment to mean that the trial court granted Quinn leave to supplement his motion, considered the motion for a new trial as supplemented, and then overruled that motion.

{¶ 15} Quinn's current appeal sets forth these 14 assignments of error:

1) The trial court found the unavoidable prevention portion of the leave to file a motion for a new trial to be correct and credible by the fact the trial court sustained the amendment to the new trial motion and denied the motion, showing the merits of the motion for a new trial were addressed by the trial court and denied.

2) The trial court failed to grant [Quinn] a new trial which is error. [Quinn] submitted documentary evidence that was withheld by the State in the form of Clark County Sheriff Reports that would have been useful in

recovering exculpatory evidence from the car, test the car for prints, after the car was found in an area where [Quinn] knows no one. The State never opposed the fact that the reports were never disclosed, their exculpatory nature, and the disregard the State had concerning discovery. Only one of the undisclosed reports were disclosed prior to May of 2016. However, the Discovery Checklist along with the transcripts were not obtained by [Quinn] until May of 2016, and those were needed to make sure the issues were not raised at trial or were on the Discovery checklist. In short, the evidence concerning the undisclosed reports were not evidence that could be used for what they are being used for until the other reports that were disclosed were gotten and sent to [Quinn] which was in May of 2016. This is well documented in affidavits and unavoidable prevention memorandum portion of the leave to file a motion for a new trial.

3) The trial court failed to award [Quinn] a new trial or an evidentiary hearing based on evidence that was presented to the court that clearly showed [Quinn] was prejudiced by the fact that the law enforcement reports that were not disclosed would have provided a means to recover the exculpatory evidence in the car. The State also had a duty to learn of any evidence favorable to [Quinn] and failed in that duty.

4) The State had possession and constructive possession of the car and failed to let the Defense know this. This impaired [Quinn's] right to * * * present a complete defense. This [is] an obvious violation of the rules of

discovery. The trial court failed to give [Quinn] a new trial or an evidentiary hearing, against due process.

5) The State failed to turn over law enforcement reports that would have shown [Quinn] was arrested some five miles from where the car was towed from, and ten hours after the car was towed. This was a violation of due process and the trial court knew this, as the trial court was given the documents to prove this fact. The trial court failed to order a new trial or an evidentiary hearing. This [is] a violation of due process.

6) The trial court failed to order a new trial when that court was given documents that were proof the investigation was shoddy and those documents were not provided to the Defense. The trial court had a duty to order a new trial or an evidentiary hearing. That failure to order a new trial or an evidentiary hearing was a violation of due process.

7) The State failed to let the defense know that the car that they claimed was used in the crimes that [Quinn] is incarcerated for was destroyed prior to trial. This is a violation of the due process of law. [Quinn] provided the necessary documents to prove this claim and the trial court failed to give [Quinn] a new trial and also failed to provide an evidentiary hearing. This violated [Quinn's] right to due process and the failure to report that the car was destroyed is a *Brady* violation.

8) One of the CSSO reports that were withheld was a Uniform Incident Report. The author of that report was in the jury pool[ ](as unreal and improper as that might sound)[.] Many issues resulted from this and they

were all violations of due process and the right to a fair trial. [Quinn] made the report available to the trial court along with the other reports. The trial court failed to grant [Quinn] a new trial or an evidentiary hearing, this is a violation of due process.

9) The trial court failed to give [Quinn] a new trial when there was an obvious *Brady* violation concerning impeachment evidence that would have changed the result of the trial. The trial court also failed to provide [Quinn] with an evidentiary hearing.

10) The trial court failed to award [Quinn] a new trial or an evidentiary hearing after [Quinn] disclosed documents that were not disclosed to him by the State that would have impeached a very important prosecution witness, the alleged victim herself.

11) The State failed to disclose information concerning the bridge that the alleged victim was taken to be thrown from being closed and impassable [ ](this a *Brady* violation)[.] The State had knowledge of this fact. Documents proving this fact were made available to the trial court and the trial court failed to grant [Quinn] a new trial or grant [Quinn] an evidentiary hearing. This [is] a violation of due process.

12) [Quinn] was prejudiced by the fact that he tested positive for opiates at the county jail and the State never made the Defense aware of this fact. The State made it a point to tell [Quinn's] family of this, and turning [Quinn's] family against him. This also would have been helpful in the production of an alternative perpetrator defense. This is a *Brady*

violation. The fact that the trial court did not afford [Quinn] a new trial, or an evidentiary hearing was a violation of due process.

13) [Quinn] was denied an opportunity to present a complete defense by the fact that material witnesses in his favor were withheld, and the car, and the exculpatory evidence in the car was not made available to the Defense. The trial court was given documentation to prove this claim but failed to provide [Quinn] an opportunity to an evidentiary hearing or a new trial. This is a violation of [Quinn's] due process rights.

14) Defense counsel was ineffective in failing to investigate the car, the house, and the bridge, after being asked to do so[ ](the car and the bridge would have given up exculpatory evidence)[.] Counsel was also ineffective for not interviewing Mark Rafferty or Mike Simms, as that would have provided the fact that [Quinn] was not even in the car that was on the video, and [was] at Mr[.] Rafferty's house when the incident occurred.

### Standard of Review

{¶ 16} A ruling on a motion for a new trial is within the trial court's discretion and will not be disturbed on appeal absent a showing of abuse of discretion. *Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, at ¶ 12, citing *State v. Schiebel,* 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). "[I]t is within the trial court's discretion to determine whether or not it is necessary to hold an evidentiary hearing on a new trial motion." *Id.*, citing *State v. Moore,* 7th Dist. Mahoning No. 13 MA 9, 2014-Ohio-358, ¶ 19. An abuse of discretion "implies that the court's attitude [was] unreasonable, arbitrary, or unconscionable." *State*

*v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

### Law Governing Motions for New Trial

{¶ 17} With regard to motions for a new trial, Crim.R. 33 provides in pertinent part as follows

(A) Grounds**.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

* * *

(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce * * * the affidavits of the witnesses by whom such evidence is expected to be given * * * [.]

{¶ 18} Motions for new trial on account of newly discovered evidence must be filed within 120 days after the jury renders its verdict, unless the defendant shows "by clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely." Crim.R. 33(B). If the court finds that the defendant was unavoidably prevented from discovering the evidence within that time, the defendant must file his motion within seven days after the court's order to that effect. *Id.*

{¶ 19} In *State v. Petro,* 148 Ohio St. 505, 76 N.E.2d 370 (1947), the Ohio

Supreme Court held that "[t]o warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *Id.* at syllabus.

{¶ 20} "While *Petro* stands for the proposition that newly discovered evidence that merely impeaches or contradicts other evidence is not enough for a new trial, we do not read *Petro* as establishing a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence." *Dayton v. Martin,* 43 Ohio App.3d 87, 90, 539 N.E.2d 646 (2d Dist.1987). "The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result." *Id.*; *accord State v. Smith,* 2d Dist. Montgomery No. 23945, 2011-Ohio-2189, ¶ 24-25; *State v. McConnell,* 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 21 (2d Dist.).

{¶ 21} Where newly discovered evidence takes the form of recantation by the prosecution's primary witness, the trial court "must make two findings: (1) which of the contradictory testimonies of the recanting witness is credible and true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?" *State v. Arnold,* 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 30 (2d Dist.), citing *Toledo v. Easterling,* 26 Ohio App.3d 59, 498 N.E.2d 198 (6th

Dist.1985).

{¶ 22} We assess the credibility of affidavits offered in support of a motion for a new trial by applying the same standard used to review affidavits supporting petitions for postconviction relief. *See Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, at ¶ 20, citing *State v. Beavers,* 166 Ohio App.3d 605, 2006-Ohio-1128, 852 N.E.2d 754, ¶ 20-21 (2d Dist.). That is, "[i]n assessing the credibility of affidavits, the trial court should consider all relevant factors, including: '(1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial.' " *State v. Calhoun,* 86 Ohio St.3d 279, 285, 714 N.E.2d 905 (1999). "Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." *Id.* "One or more of the *Calhoun* factors, to the extent that any of them apply, may be sufficient to justify a conclusion that an affidavit asserting information outside the record lacks credibility." *Beavers* at ¶ 21.

### *Application of Doctrine of Res Judicata to Successive Motions for New Trial*

{¶ 23} "Pursuant to the doctrine of res judicata, a valid final judgment on the merits bars all subsequent actions based on any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *State v. Reed*, 2d Dist. Montgomery No. 26526, 2015-Ohio-3051, ¶ 26, quoting *State v. Collins,* 2d Dist.

Montgomery No. 25612, 2013-Ohio-3645, ¶ 9. "Res judicata applies to any defense that was raised or could have been raised in a criminal defendant's prior direct appeal from his conviction." *Id.*, quoting *Collins* at ¶ 9. Additionally, arguments advanced in a successive motion for a new trial may be barred by the doctrine of res judicata. *See id.* at ¶ 28 (where appellant "previously filed a motion for a new trial," res judicata bars use of successive new trial motion to raise issues that could have been asserted in prior motion). *See also State v. Shabazz*, 8th Dist. No. 100623, 2014-Ohio-3142, ¶ 13 ("successive motions for a new trial are barred by res judicata"); *State v. Moore*, 3d Dist. Allen No. 1-08-27, 2008-Ohio-6751 (arguments made in successive motion for new trial barred by res judicata).

{¶ 24} In *Quinn II*, we rejected Quinn's prior request for a new trial based on affidavits in which Beverley sought to recant her trial testimony identifying her son as her assailant. *See Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, at ¶ 20-22. To the extent that Quinn's current, successive motion for a new trial likewise depends on affidavits in which Beverley proposes that a different person perpetrated the crimes of which Quinn was convicted, those arguments are barred by res judicata. Res judicata also precludes Quinn from now advancing any other arguments that could have been but were not raised in that prior motion for a new trial. *See Reed* at ¶ 28.

### Assignment of Error 1 – "Unavoidably Prevented" and New Evidence

{¶ 25} Quinn's first assignment of error appears to assert that we are required to assume that he was unavoidably prevented from previously presenting evidence that he now advances in support of his motion for a new trial. Quinn urges that the trial court implicitly found that he had demonstrated he was unavoidably prevented from discovering

that evidence. *See* Crim.R. 33(B). He further asserts that the State "waived any evidentiary challenges" to his current motion by failing to file an opposing memorandum in the trial court. We accept neither premise.

**{¶ 26}** In granting Quinn's motion to amend his latest motion for a new trial, the trial court made no finding, either express or implied, regarding whether Quinn had satisfied Crim.R. 33's requirements for filing a delayed motion for a new trial. (*See* Trial Court Docket # 90.) A court may rule on a motion to amend without passing on the merits of the underlying filing to be amended. In this instance, the trial court denied Quinn's motion for a new trial without addressing whether Quinn was unavoidably prevented for purposes of Crim.R. 33 from discovering the purported new evidence on which that motion was based.

**{¶ 27}** Additionally, the State did not concede Quinn's arguments by failing to dispute them before the trial court. Although waiver may occur as a result of failure to oppose evidence offered in support of a motion for summary judgment, that principle does not apply as to evidence supporting other motions. *See Bank One Trust Co., N.A. v. Reynolds*, 2d Dist. No. 22465, 2008-Ohio-5512, ¶ 7-9. The State remains free to challenge the evidence offered in support of Quinn's appeal.

**{¶ 28}** Quinn's first assignment of error is overruled.

### *Assignments of Error 2, 3, 4, 5, 6, 7, & 13 – Exculpatory Evidence from Car*

**{¶ 29}** Most of Quinn's current assignments of error relate to his claim that he was deprived of potentially exculpatory evidence associated with the car used in Beverley's kidnapping. Quinn argues that the State denied him due process by failing to disclose law enforcement records regarding where the car was found, towed, and impounded, by

failing to properly inventory the car's contents and/or to share any inventory with Quinn's counsel, by denying Quinn's counsel access to the car, and by destroying the car before Quinn's trial. He argues that any fingerprints left in or on the car, a note, a coat and a cellphone allegedly seen inside the car, and the abandoned car's location vis-à-vis where Quinn was arrested all could have supported a defense that a different person committed the crime. We will address all contentions related to evidence in the car by category.

### a. Failure to Disclose Evidence – Brady violation

{¶ 30} "In *Brady v. Maryland,* the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Disciplinary Counsel v. Kellogg-Martin,* 124 Ohio St.3d 415, 2010-Ohio-282, 923 N.E.2d 125, ¶ 24, citing *Brady,* 373 U.S. 83, 87, 83 S.Ct. 194, 10 L.Ed.2d 215 (1963). In order to establish a *Brady* violation, the defendant must demonstrate that (1) the prosecution failed to disclose evidence upon request; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *State v. Wade,* 2d Dist. Clark No. 06-CA-108, 2007-Ohio-6611, ¶ 12. Evidence suppressed by the State "shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Aldridge*, 120 Ohio App.3d 122, 145, 697 N.E.2d 228 (2d Dist.1997), quoting *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 31} As an initial matter, no cognizable evidence in the record establishes that the State failed to provide to Quinn's counsel through discovery the various law

enforcement reports referenced in Quinn's arguments. (*See* Assignments of Error #2, #3, #5 & #6.)[3] Although Quinn *argues* that such records were not produced prior to trial, he has submitted neither his own affidavit nor an affidavit from his trial attorney substantiating that claim. In addition, none of the documents now submitted by Quinn has been properly authenticated. Unauthenticated documents are not admissible as evidence and thus do not provide proper support for a motion for a new trial. *See State v. Brown*, 8th Dist. Cuyahoga No. 805533, 2002-Ohio-3635, ¶ 59-60.

**{¶ 32}** Irrespective of those omissions, however, and more importantly, Quinn has not shown that the subject records were favorable to him in a way that would have materially assisted his defense. Although the various documents as produced do combine to show both the location in which the car used for the kidnapping was abandoned on the night of December 14 and the location where Quinn was arrested at 2:15 p.m. the next day, those facts alone would not support an inference that Quinn was not the driver of the car involved in the kidnapping. Even accepting as true Quinn's assertion (again not supported by cognizable evidence) that he "was arrested some five miles from where the car was towed from, and ten hours after the car was towed" (*see* Assignment of Error #5), our conclusion would not change. Given the ease with which five miles could be traversed

---

[3] Specifically, Quinn advances a "Uniform Incident Report" from the Clark County Sheriff's Office dated 12/15/13, which specifies a location from which Beverley's abandoned car was towed on that date because it posed "a traffic hazard" (*see* 8/3/18 Motion for New Trial Pursuant to Criminal Rule 33, Exh. 1); a Clark County Sheriff's Office "Tow Log" indicating that such car "was crushed on 3/19/2014" (*id.*, Exh. 4); a "Law Enforcement Arrest Report" indicating when and where Quinn was arrested (*id.*, Exh. 5); a Clark County Sheriff's Office "Detail Call Sheet" dated 12/15/13, recording a "traffic complaint" about Beverley's car and the car's location (id., Exh. 6); and a "Law Enforcement Arrest Report Probable Cause Affidavit" from the Clark County Municipal Court dated 12/14/13, reflecting where and when Quinn was arrested. (*Id.*, Exh. 7).

in 10 hours, evidence of the distance between the abandoned car and the site of Quinn's arrest was not material to the outcome of Quinn's trial.

{¶ 33} Neither are we persuaded that the State impermissibly withheld documents about the towing of Beverley's car. Nothing in the record establishes that the State failed to produce those documents. Moreover, nothing on the face of those documents materially "favors" Quinn. *See Wade*, 2d Dist. No. 06-CA-108, 2007-Ohio-6611, at ¶ 12*.* Quinn implies that disclosure of those documents could have led to the discovery of other admissible evidence "sufficient to establish a reasonable probability of a different result" in his trial.[4] For example, he urges that disclosure of the Uniform Incident Report would have made the defense aware of a potential witness who saw the man who abandoned Beverley's car, and might have "changed [Quinn's] mind on whether he should testify himself." (Assignment of Error #13.) However, as discussed more fully below, given the strength of Beverley's trial testimony identifying her son as her assailant, Quinn has not demonstrated that any information derived from those documents would have materially assisted his defense.

{¶ 34} Because Quinn is unable to establish a *Brady* violation relative to the purportedly undisclosed documents, his assignments of error based on the State's alleged failure to disclose those documents is overruled.

### b. Destruction of Evidence

{¶ 35} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the State

---

[4] Although Quinn purports to quote *United States v. Phillip*, 948 F.2d 241, 248 (6th Cir.1991) for this proposition, that language does not appear in *Phillip.*

either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence." *State v. McClain*, 2016-Ohio-838, 60 N.E.3d 783, ¶ 21 (2d Dist.), citing *State v. White,* 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 58 (2d Dist.). "Evidence is 'materially exculpatory' if it (1) possesses 'an exculpatory value that was apparent before the evidence was destroyed' and (2) is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Id.*, citing *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74.

{¶ 36} "In contrast, evidence is not materially exculpatory if it is merely potentially useful." *State v. Cox,* 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 88. "Potentially useful" evidence "may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith." *Id.* Bad faith "implies something more than bad judgment or negligence." *Powell* at ¶ 81. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." (Citations omitted.) *Id.* The defendant bears the burden to prove that the evidence in question was materially exculpatory, not merely potentially useful. *Id.* at ¶ 74.

{¶ 37} Quinn contends that the State violated his right to due process by allowing the car used in the kidnapping and its contents to be destroyed by the towing company prior to his trial. (*See* Assignments of Error #3 and #7.) He suggests that the car contained materially exculpatory, or at least potentially useful, evidence in the form of fingerprints as well as a note, cell phone, and jacket that did not belong to Quinn and may have

pointed to a different perpetrator. In support of his motion for a new trial on this basis, Quinn filed what he termed the "affidavit" of Michael E. Simms, who describes purportedly exculpatory evidence that he claims to have seen inside Beverley Quinn's car. (Trial Court Docket #77, Exh. 3, Affidavit of Mike Simms.) Quinn also offered his mother's "affidavit" stating that her car "had a strange male coat and telephone in it." (*Id.*, Exh. 2, 1/29/15 Affidavit of Beverley Quinn.)

{¶ 38} We determine that the trial court did not abuse its discretion by declining to grant a new trial on the basis of the purported "affidavits" Quinn filed. Beverley's assertion that a different person was responsible for the subject crimes was presented and rejected in Quinn's previous motion for a new trial. *See Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, ¶ 20-22. Simms's statements to the same effect apparently could have been raised at that time as well, given Simms's assertion that Quinn's trial attorney was aware of Simms's status as a potential witness. (*See* Trial Court Docket #77, Exh. 3.) Arguments based on the potential evidence Beverley and Simms claim to have witnessed thus are barred by res judicata. *See Reed*, 2d Dist. Montgomery No. 26526, 2015-Ohio-3051, at ¶ 28.

{¶ 39} In addition, neither Beverley's nor Simms's proposed "affidavit" is presented in proper form. "An affidavit must appear, on its face, to have been taken before the proper officer and in compliance with all legal requisites." *In re Disqualification of Pokorny*, 74 Ohio St.3d 1238, 657 N.E.2d 1345 (1992). While the "affidavits" proffered by Beverley and Simms do bear the signature and seal of a notary public, nowhere do those documents state that the affiants were identified to, sworn by, and affixed their signatures in the presence of the notary public. (*See* Trial Court Docket #77, Exhs. 2 & 3.) "A paper

purporting to be an affidavit, but not to have been sworn to before an officer, is not an affidavit." *Pokorny* at 1238. Because the documents produced by Quinn do not comport with the requirements for affidavits, they are not cognizable evidence.

{¶ 40} The documents presented in conjunction with Quinn's motion for leave to supplement his motion for a new trial do not remedy those omissions. (*See* attachments to Trial Court Docket #89.) In one attachment to that motion, Beverley attests that all prior documents bearing her signature and labeled as affidavits "were signed in front of a notary * * * and sworn to verbally." (*Id.*, 8/1/17 Affidavit of Beverley Quinn.) Although that document itself appears to be in proper affidavit form, it does not correct the facial deficiencies of her prior filings. The newly proffered affidavit of Michael Simms is exactly the same "affidavit" he offered previously, but with this typewritten line added at the bottom: "This was sworn to on the above date. The signature was in my presence[.]" (*Id.*, 8/1/17 Affidavit of Michael E. Simms.) No new date or notary seal appears, and the document bears no indicia that the additional sentences were added by or in the presence of an individual authorized to administer oaths. As such, it is not acceptable evidence.

{¶ 41} Even if we were to overlook those deficiencies, the evidence described within those purported "affidavits" also would not qualify as "newly discovered." Although neither affidavit identifies the date on which the affiant claims to have seen evidence inside Beverley's car, those observations must have predated the car's destruction on March 19, 2014. (*See id.*, Exh. 4, Clark County Sheriff's Office Tow Log.) Crim.R. 33 provides for the granting of a new trial on the basis of new evidence only where "the defendant could not with reasonable diligence have discovered and produced [that evidence] at the trial." Crim.R. 33(A)(6). Because Simms's proffered affidavit admits that

Quinn's trial counsel knew prior to trial that Simms was a potential witness (*see* Trial Court Docket #77, Exh. 3), Simms's evidence is not "newly discovered" for purposes of Crim.R. 33 relief.

{¶ 42} The same is true as to Beverley's knowledge of any exculpatory evidence contained within her car. Furthermore, Beverley's proffered affidavit on this issue suffers from the same infirmity found to undermine the credibility of earlier affidavits she offered in support of Quinn's previous motion for a new trial. *See Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, at ¶ 21. Once again, because Beverley's latest affidavit offered as proof that Quinn was not her assailant directly contradicts her credible and well-corroborated trial testimony that her son indeed *was* the man who kidnapped and assaulted her, consideration of the relevant factors enumerated in *Calhoun,* 86 Ohio St.3d 279, 285, 714 N.E.2d 905, compels a conclusion that her current affidavit is not credible and does not warrant the granting of a new trial.

{¶ 43} Finally, to the extent that Quinn claims the destruction of Beverley's car deprived him of potentially exculpatory fingerprint evidence, we likewise conclude that the trial court did not err by failing to grant a new trial on that basis. The possibility that fingerprints of the alternative perpetrator Quinn proposes might have been left in the car is not "newly discovered" evidence. *See* Crim.R. 33(A)(6). Additionally, because the presence of other fingerprints is merely a possibility, not a certainty, any fingerprint evidence would be "potentially useful," not "materially exculpatory." *See Cox,* 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 88. Accordingly, the State's destruction of any such evidence would constitute a violation only if done in bad faith. *See id.*

{¶ 44} The record before us would not support a finding that the State acted in bad

faith with respect to the destruction of Beverley's car. It appears that the car was "crushed" at the instance of the towing company, not the State (*see* Trial Court Docket #77, Exh. 4), and that such action was taken only because Beverley failed to retrieve her vehicle from impound in a timely manner. (*See id.,* Exh. 2 & Exh. 21 [5/4/16 Affidavit of Beverley Quinn].) Moreover, in light of Beverley's identification of her son as her assailant, the State reasonably could have concluded that gathering evidence from Beverley's car was unnecessary in order to prosecute the case. Given those circumstances, no bad faith can be imputed to the State. Quinn's inability to present any fingerprint evidence that might have been obtainable from the car is not valid grounds for a new trial under Crim.R. 33. Quinn's assignment of error based on the destruction of the car is overruled.

### c. Failure to inventory car contents/to provide access to car

{¶ 45} We reach a similar conclusion regarding Quinn's arguments as to the State's alleged failure to provide his trial counsel with an inventory of the car's contents or to provide his trial counsel access to that vehicle before it was destroyed. (*See* Assignment of Error #13.) Absent credible, cognizable evidence that the car contained evidence favorable to Quinn and that there is a reasonable probability that such evidence would have led to a different outcome, any omission by the State in those regards would not warrant a new trial. *See Wade,* 2d Dist. No. 06-CA-108, 2007-Ohio-6611, at ¶ 12; *Aldridge,* 120 Ohio App.3d at 145, 697 N.E.2d 228. Quinn's challenge on that basis is not well taken. And, again, none of these arguments arises from newly discovered evidence.

{¶ 46} For the foregoing reasons, Quinn's second, third, fourth, fifth, sixth, seventh, ninth and thirteenth assignments of error are overruled.

### Assignment of Error #8 – Potential Witness in Jury Pool

{¶ 47} In his eighth assignment of error, Quinn contends that his rights to due process and a fair trial were violated because the law enforcement officer who prepared one of the reports allegedly not disclosed by the State during discovery was a member of the venire from which Quinn's jury was chosen. Specifically, Quinn asserts that Deputy Brian Melchi of the Clark County Sheriff's Office authored the "Ohio Uniform Incident Report" related to the complaint that led to Beverley's abandoned car being towed (*see* Trial Court Docket #77, Exh. 1), and that Melchi also was in Quinn's jury pool.

{¶ 48} As we noted above, Quinn did not produce an authenticated copy of the incident report at issue, and no cognizable evidence before us establishes that the State did not produce that report to Quinn's attorney, or when Quinn otherwise became aware of that document. Nevertheless, even assuming that Quinn was unavoidably prevented from discovering that Melchi had been involved in the towing of Beverley's car, Quinn has not demonstrated that Melchi's tangential involvement[5] in the case combined with his presence in the jury pool denied Quinn due process or a fair trial.

{¶ 49} The entirety of the proffered incident report's substantive content attributable to Deputy Melchi was as follows:

On [December 15, 2013], dispatch was advised of a vehicle parked at [address omitted], a white Hyundai Elantra, Ohio license plate [omitted]. This is the suspect vehicle from a domestic violence and abduction case from the Springfield Police Department. The owner of the vehicle is the victim in this case, however the suspect, her son Mr. Quinn was in possession of the vehicle. The vehicle was unoccupied at the time we

---

[5] Melchi did not serve as a juror. *See* ¶ 49, below.

arrived. A neighbor advised the vehicle had been there since last night. He further stated the driver of the vehicle stated it ran out of gas and he would return for it later. Springfield police advised they did not need the vehicle for anything at this time. Due to the way the vehicle was parked, which was part of the way in the roadway at the curve, it was towed due to being a traffic hazard. Maines Towing removed the vehicle from the scene, Tow #13-67777.

(Trial Court Docket #77, Exh. 1, p. 2.) Accepted at face value, that report would show that Deputy Melchi had some knowledge of a reported domestic violence and abduction incident involving Quinn, Quinn's mother, and her car, but was not further involved in the investigation of that incident by a different law enforcement agency.

{¶ 50} The transcript of jury selection reflects the following:

[ASSISTANT PROSECUTOR]: * * * Mr. Melchi, in my notes I gotta come back to you. You are a deputy Sheriff and have been in that position for a number of years now?

JUROR #11: Fifteen.

[ASSISTANT PROSECUTOR]: This case does not involve the Clark County Sheriff's Department. Have you had any discussions with anyone who is involved with this case about this case?

JUROR #11: I'm not sure exactly which case it is. I am familiar with the defendant though.

[ASSISTANT PROSECUTOR]: I'm not going to ask you anymore [sic] questions. * * *

(Tr. Vol. I, pp. 28-29.)

* * *

THE COURT: Any challenge for cause?

[ASSISTANT PROSECUTOR]: Pass for cause, Your Honor.

[DEFENSE COUNSEL]: We would pass for cause as well.

THE COURT: All right. Did you want to exercise a preemptory [sic] challenge?

[DEFENSE COUNSEL]: Yes, We'd like to excuse Juror #11.

THE COURT: Thank you, Mr. Melchi. You are excused.

(Tr. Vol. I, p. 42.)

{¶ 51} Trial courts are granted broad discretion in assessing the impact on jurors of "outside influences" and in crafting an appropriate remedy. *State v. Cox*, 2d Dist. Montgomery No. 24577, 2013-Ohio-4941, ¶ 83, citing *State v. Williams*, 2d Dist. Montgomery No. 22126, 2008-Ohio-2069, and *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E2d 643 (1995). In *Cox*, a defendant convicted of sexual offenses against his minor stepdaughter argued that his jury pool was "poisoned" when a potential juror indicated that she "had seen the case covered on the local news" and that she "[o]bviously" had formed opinions about the case. *Id.* at ¶ 79. Noting that the potential juror's response was "ambiguous" and unelaborated, and that she was excused from serving on the jury, we concluded that her comments did not "poison" the jury. *Id.* at ¶ 80.

{¶ 52} In the same case, the defendant further contended that he was prejudiced due to a juror who had observed a spectator in the courtroom "mouthing" encouragement to the defendant and the same juror's "accidental[ ] expos[ure] to information about the

case" while out to dinner. *Id.* at ¶ 81-82. After each incident, the court questioned the juror outside the presence of the other jurors and asked whether what she had heard or observed would affect her ability to be impartial. *Id.* When the juror said that the latter incident would prevent her from being fair and impartial, she was excused. *Id.* at ¶ 82. Under those circumstances, this court saw "no basis to find that these incidents affected [the defendant's] right to a fair trial or that he suffered prejudice as a result." *Id.* at ¶ 83.

{¶ 53} The case now before us presents a more benign example of "outside influences" on a jury pool. As soon as Deputy Melchi indicated that he was "familiar" with Quinn, the assistant prosecutor conducting jury selection on behalf of the State immediately ceased questioning him further about his knowledge of Quinn or this case. As a result, no information, ambiguous or otherwise, emerged that possibly could have contaminated the jury pool. Moreover, because Deputy Melchi was excused based on defense counsel's peremptory challenge, he never was seated on the jury at all, unlike the juror in *Cox*.

{¶ 54} Although Quinn suggests that he was prejudiced because he was forced to use a peremptory challenge to remove a prospective juror who should have been removed for cause, we previously determined that Quinn failed to establish that Melchi should have been removed for cause. *See Quinn III*, 2017-Ohio-7000, 95 N.E.3d 664, ¶ 17-18. Further argument regarding that issue thus is barred by res judicata. Moreover, nothing has been newly discovered, and there is no indication that Quinn was prejudiced by Deputy Melchi's brief presence and innocuous comments as part of the jury pool, Quinn's assignment of error on that basis is overruled.

### Assignment of Error #9 – Denial of Evidence to Impeach Officer

{¶ 55} In another assignment of error arising from the destruction of Beverley's car prior to his trial, Quinn claims that the State's failure to disclose documentation that the car had been destroyed deprived him of information that could have been used to impeach a law enforcement officer who testified that "access" to Beverley's vehicle "should be" available. A new trial is not warranted on the basis of that contention.

{¶ 56} The witness at issue is Springfield Police Officer Paul R. Herald, Jr., who was the first officer to respond to the report that Beverley had been assaulted. (*See* Tr. Vol. I, pp. 113-114.) On cross-examination, Quinn's trial attorney asked whether law enforcement officers "would have access to [Beverley's] vehicle" in order to search for evidence such as loose hair pulled from Beverley's head, consistent with her report. (*Id.* at pp. 136-137.) When Officer Herald responded that "[t]here should be access to it," Quinn's counsel moved to a different line of questioning. (*Id.* at p. 137.)

{¶ 57} The record does not support Quinn's suggestion that he would have been better positioned to impeach Officer Herald's testimony if Quinn had been aware of the car's destruction. Read in context, the question about access to Beverley's vehicle apparently was intended to illustrate that police had presented no evidence to corroborate Beverley's version of events, despite their ability to search one place where such evidence might have been found. Earlier in his cross-examination, Officer Herald shared the following exchange with Quinn's trial counsel:

Q. Was the vehicle ever impounded?

A. Not to my knowledge. I don't know.

Q. Did you ever try to seek out that vehicle?

A. No, sir. I was handling mainly the victim and the crime scene area and

the charges.

Q. If the vehicle was impounded, you would have access to that vehicle if you wanted to search it for evidence?

A. Once I filed the charge, the paperwork goes to the detective bureau and they would probably have access.

Q. Okay. Do you know whether or not the detectives ever looked into that vehicle?

A. No sir, I do not.

(Tr. Vol. I, p. 136.)

**{¶ 58}** Because Officer Herald said that he did not know whether Beverley's car had been impounded or searched, and that detectives, not he, would be the law enforcement representatives likely to have access to that vehicle, no credibility issue can be inferred from his testimony that the car "should be" accessible. Accordingly, information showing that the car had been destroyed "5 days prior to trial" would not have enhanced Quinn's ability to impeach Officer Herald's testimony. Contrary to Quinn's assertion that revelation of the car's destruction "would have resulted in a mistrial," the record discloses no error in that regard.

**{¶ 59}** For that reason and other previously stated reasons, including Quinn's reliance on unauthenticated documents, the lack of newly-discovered cognizable evidence regarding the alleged non-disclosure of those documents, and the possible res judicata effect of Quinn's failure to raise this argument in his prior motion for a new trial, his ninth assignment of error is overruled.

*Assignment of Error #10 – Denial of Evidence to Impeach Beverley*

{¶ 60} Quinn's tenth assignment of error asserts that the State's failure to disclose a report from the Clark County Sheriff's Department about Beverley's assault and abduction impeded Quinn's ability to impeach Beverley's trial testimony. Based on a hospital record's notation that a "Sheriff deputy" was "taking [a] report from" Beverley in the emergency room on December 14, 2013 (*see* Trial Court Docket #77, Exh. 10), Quinn argues that the State withheld a report that could have been used to show that Beverley told the deputy "that she was not sure who assaulted her." The record does not support that argument.

{¶ 61} As an initial matter, Quinn again has failed to present cognizable evidence to show that the State withheld any requested document of which it was aware. Indeed, in this particular instance, Quinn has not even established that the alleged "report" in fact exists. The only indication that a report was taken by the Clark County Sheriff's Department appears within an unauthenticated document that is not cognizable evidence. Moreover, even that document states that Beverley "report[ed] that *her son* was hitting her with his hand, pulling, grabbing her anywhere he could, including her hair while she was in the car." (Emphasis added.) (*Id.*) Thus, the very document on which Quinn relies as support for the existence of an undisclosed "report" suggests that such report would be consistent with, not contradictory to, Beverley's trial testimony that Quinn was her assailant. A document with that content would have no impeachment value.

{¶ 62} Although Quinn cites to another "affidavit" from Beverley for the proposition that she told a Clark County Sheriff's deputy "that she was not sure who assaulted her," that argument, too, suffers from significant flaws. The "affidavit" Quinn advances is not in proper evidentiary form (*see* Trial Court Docket #77, Exh. 9, 5/4/16 Affidavit of Beverley

Quinn), and Beverley's claims as to what she stated to the deputy at the hospital did not qualify as "newly discovered." Moreover, we previously determined that Beverley's post-trial attempts to refute her trial testimony were not credible, rendering that issue res judicata. *See Quinn II*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, ¶ 20-22. For all those reasons, Quinn's tenth assignment of error is overruled.

### *Assignment of Error #11 – New Evidence of Bridge Closure*

{¶ 63} Quinn next argues that he was denied due process when the State failed to disclose that the bridge from which Quinn allegedly threatened to throw his mother was closed at the time the offense occurred, and when the trial court denied his motion for a new trial based on evidence of the bridge's closure. In support of his new trial motion, Quinn presented the trial court with a sworn but not notarized statement signed by his mother, stating that the Clark County Engineer told Beverley that the Tremont City Road bridge[6] "was closed due to being unsafe" on an unspecified date in 2013 before being "deemed safe for travel" in June 2015. (*See* Trial Court Docket #77, Exh. 11.) Quinn also presented the affidavit of Jason Egan, who attested that he "knew that [Tremont City Road] bridge was closed and had obstructions that made it not possible to go onto the bridge." (*Id.*, Exh. 12, Affidavit of Jason Egan.) Those documents do not demonstrate that the trial court erred in denying Quinn a new trial.

{¶ 64} Evidence that the subject bridge was closed throughout 2014 would have been available at the time of trial, and Quinn has not demonstrated that he was "unavoidably prevented" from discovering that evidence at that time. Additionally, Quinn

---

[6] During her trial testimony, Beverley did not use the name "Tremont City Road bridge," but she did testify that Quinn drove her "down #334" and turned left to a bridge, which she later determined was "very close to Tremont City." (Tr. Vol. I, pp. 193, 195).

is barred by res judicata from raising an argument that could have been but apparently was not presented in his initial motion for a new trial. Beverley's unsworn statement based on hearsay is not cognizable evidence of the subject bridge's closure, and Egan's affidavit specifies neither the basis for his alleged knowledge about the bridge nor the dates when that bridge supposedly was closed. (*See id.*)[7] Furthermore, no foundation exists for Egan's opinion that "the chances of [Quinn's] taking someone to a closed and barricaded bridge is slim to none." (*Id.*) Quinn's eleventh assignment of error is overruled.

### *Assignment of Error #12 – Undisclosed Drug Test Results*

{¶ 65} Quinn claims in his twelfth assignment of error that he was prejudiced by the State's failure to disclose to his trial counsel that Quinn had tested positive for opiates at the county jail.[8] Quinn suggests that he could have presented "a more complete alternative perpetrator defense" had he known of the positive test result he could use as evidence "that Samantha [Ferrell] * * * put heroin in his drink the night of the incidents in question," so that Ferrell could "rent [Beverley's] car out for drugs, and have Beverley killed or robbed."

{¶ 66} To support the plausibility of that defense, Quinn offered Beverley's "affidavit" stating that on "12/13,"[9] she "walked in on Samantha injecting something into Jim's vodka," causing Ferrell to threaten to "get her boyfriend to kill" Beverley. (*See* Trial

---

[7] Egan's affidavit also provides no information about his relationship to this case; the State's opposing brief indicates that Egan is a fellow inmate of Quinn's at the London Correctional Institution.

[8] Quinn's brief also asserts that the State *did* share his positive drug test results with Quinn's family, "turning [his] family against him," but offers no argument as to why that alleged conduct would warrant a new trial.

[9] The date thus referenced is unclear. (*See* Trial Court Docket #77, Exh. 2, 1/29/15 "Affidavit" of Beverley Quinn).

Court Docket #77, Exh. 2, 1/29/15 Affidavit of Beverley Quinn.) That document then posits that the man who later abducted Beverley "must have been Samantha's boyfriend." (*Id.*) In addition, Quinn presented Simms's "affidavit" stating that he witnessed "Ferrell and a man putting gas in Beverley's white station wagon" and that Ferrell told him "[s]he was getting drugs for renting this man Beverley's car." (*Id.*, Exh. 3.) That document further avers that Simms later saw "a letter on the inside of [Beverley's] car under the windshield that was thanking Samantha for renting the car to" the man Simms witnessed with Ferrell earlier. (*Id.*) Finally, Quinn attached what purports to be a copy of a Ohio State Highway Patrol Report of Investigation dated September 10, 2013, related to an "Unauthorized Use" charge against a man for driving a "white station wagon type vehicle" that had been reported to the Springfield City Police Department as stolen. (*Id.*, Exh. 13.)

{¶ 67} Once again, Quinn has presented no competent evidence to support his argument. No evidence before us corroborates Quinn's claim to have tested positive for opiates. In addition, neither Beverley's nor Simms's purported affidavit is in proper evidentiary form. The Ohio State Highway Patrol Report has not been authenticated, and also does not establish that the car in question belonged to Beverley, that the man arrested had "rented" the car from Ferrell or was the same man allegedly seen with Ferrell on the date of Beverley's assault and abduction, or that use of the car was being exchanged for drugs. In addition, Quinn has presented no evidence to show that he personally was unaware that he had tested positive for opiates, or that the State failed to provide that information to his trial attorney.

{¶ 68} Beyond those evidentiary deficiencies, Quinn also has not demonstrated a reasonable probability that, had evidence of his positive test for opiates been disclosed

to the defense, "the result of the proceeding would have been different." *See Aldridge*, 120 Ohio App.3d at 145, 697 N.E.2d 228. To find that evidence of Quinn's opiate use created reasonable doubt that Quinn was responsible for the crimes against Beverley would require a jury not only to make a series of inferences not supported by cognizable evidence, but also to disregard Beverley's sworn trial testimony that her son was her assailant. Quinn's twelfth assignment of error is overruled.

### *Assignment of Error #14 – Ineffective Assistance of Counsel*

{¶ 69} Quinn's fourteenth assignment of error asserts that he was denied the effective assistance of counsel due to his trial attorney's failure to investigate Beverley's home and car and the bridge, as well as his failure to interview potential defense witnesses Simms and Mark Rafferty. That assertion is not well taken.

{¶ 70} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. A defendant is entitled to "reasonable competence" from his or her attorney, not "perfect advocacy." *See Maryland v. Kulbicki*, __ U.S. __, 136 S.Ct. 2, 5 (2015), citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003).

{¶ 71} "*Strickland* and its progeny establish that when a court is presented with an ineffective-assistance-of-counsel claim, it should look to the full record presented by the defendant to determine whether the defendant satisfied his [or her] burden to prove deficient performance." *Reeves v. Alabama*, __ U.S. __, 138 S.Ct. 22, 26, 199 L.Ed.2d 341 (2017). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

{¶ 72} Nothing in the record supports Quinn's contention that his trial counsel rendered ineffective assistance. Quinn has presented no affidavit or other cognizable evidence to substantiate his claim that his attorney failed to look into the matters about which Quinn now complains. Furthermore, having concluded above that Quinn failed to demonstrate that Beverley's car in fact contained evidence that would have materially assisted his defense, we cannot conclude that his trial attorney provided deficient representation by failing to search that car for evidence that may not have existed. *See Strickland* at 688.

{¶ 73} Neither has Quinn demonstrated a reasonable probability that any evidence obtainable from Beverley's home would have led to a different outcome at trial. Quinn contends that a visit to the house "would have revealed that the door [to Beverley's bedroom] had been broken down," despite Beverley's trial testimony that "there are little things you can use to get in the door." (*See* Tr. Vol. I, p. 183.) However, evidence that Quinn knew how to access Beverley's bedroom without breaking down the door as her

assailant did is not reasonably likely to have overcome Beverley's unequivocal testimony that it was Quinn who took her from her bedroom and to the bridge. Additionally, especially absent cognizable evidence that the bridge in fact was closed and could not have been accessed in the way to which Beverley testified, we cannot begin to conclude that Quinn's trial counsel performed deficiently by allegedly failing to explore the bridge's accessibility on the night in question.

{¶ 74} Neither has Quinn shown that his trial attorney performed deficiently by failing to interview potential witnesses Simms and Rafferty. Although Quinn's counsel apparently was aware of Simms's availability as a potential witnesses, that attorney is entitled to "a strong presumption" that he acted reasonably in choosing not to call Simms to testify. *See Strickland* at 688. Only Simms's non-cognizable "affidavit" is offered to show that Quinn's trial attorney never interviewed him. (*See* Trial Court Docket #77, Exh. 3.) Based on the record, we are unable to conclude that the testimony Simms now proposes to have been able to offer on Quinn's behalf (*see id.*) was reasonably probable to convince the jury that Beverley was mistaken in identifying her son as her assailant.

{¶ 75} Similarly, only the purported "affidavit" of Mark Rafferty suggests that Quinn's attorney was aware that Rafferty was a potential witness, and that document is not competent evidence. (*See id.*, Exh. 15.) While Rafferty therein claims to have seen Quinn asleep in Rafferty's home "with a stench of alcohol coming from him" on "the morning * * * Quinn was to have committed these crimes," that document is not cognizable evidence that Rafferty could have provided an alibi for Quinn on the night at issue in this case. And even were we to determine that Rafferty's supplemental affidavit offered later were cognizable evidence (*see* Trial Court Docket #89, 8/3/17 Affidavit of Mark Rafferty),

we once again are unable to conclude that testimony from one of Quinn's close friends contradicting the identification testimony of Quinn's own mother is newly discovered evidence or would have created a reasonable probability of a different outcome. *See Strickland* at 688. Accordingly, the record does not support a conclusion that Quinn's trial attorney performed deficiently by failing to call Rafferty and Simms as witnesses, and Quinn's fourteenth assignment of error is overruled in its entirety.

### ***Conclusion***

**{¶ 76}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Andrew P. Pickering
James E. Quinn
Hon. Douglas M. Rastatter