[Cite as *State v. Quinn*, 2016-Ohio-140.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2014-CA-95 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 13-CR-869 |
| v. | : | |
| | : | (Criminal Appeal from |
| JAMES QUINN | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of January, 2016.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}  Defendant-appellant James Quinn appeals from an order of the Clark

County Common Pleas Court overruling his motion for a new trial based on newly discovered evidence. The State argues that the evidence is not newly discovered and is solely designed to impeach the credibility of the victim's trial testimony. We conclude that the trial court did not err by overruling the motion without conducting a hearing, because the record supports the trial court's conclusion that the victim's testimony at trial was more credible than her recantation, and even if the new evidence was presented to the jury there is not a strong probability that the outcome would be different. Therefore, the order overruling the motion for a new trial is Affirmed.

## I. The Assault on Quinn's Mother

{¶ 2} The victim, Beverly Quinn, is a 79-year-old woman, the mother of two daughters and two sons, including the defendant, James Quinn. In December 2013, Quinn's girlfriend, Samantha Ferrell, was living with Quinn's mother, Beverly, in her two-bedroom house. At that time, Quinn was under indictment for a domestic violence incident involving his mother; as a condition of bond he was subject to a no-contact order with his mother. Late in the evening, Beverly was awakened by noise, and found Quinn and Ferrell in her home, drinking vodka and watching television. Beverly told Quinn he was not allowed to be there and asked Quinn to leave, to turn off the television, and for Samantha to go to her room. Quinn became very angry with his mother, pushed her into a chair, and hit her. When Quinn suggested to Samantha that they take his mother to "mental health," Samantha suggested that they take Beverly out into the country and dump her. Beverly then ran to her own bedroom, locked the door, and left the house by crawling out of the bedroom window. Beverly went to a neighbor's house and called the

police. During the 911 call, Quinn identifies her son, James Quinn, as the person who has abused her, and states that Quinn left her house driving a white station wagon. Quinn and Samantha left Beverly's house before the police arrived. The police took photos of Beverly's bruises, and allowed her to return to her own home after they verified it was empty and secured. One of the two officers who spoke with Beverly at this time testified that Beverly was very articulate and said it was her son who had struck her in the face. No charges were filed against Quinn at this time.

{¶ 3} According to Beverly's testimony at trial, several hours later Quinn returned to his mother's home, without Samantha, forced entrance into his mother's bedroom, and forced his mother to leave the house with him, threatening to take her to the country and make her jump off a bridge. Beverly described her son as very angry and intoxicated on alcohol and drugs. Beverly left with her son because she felt she had no choice. He drove out into the country, stopped at a bridge and said, "if you don't jump, I'll push you." According to Beverly, Quinn decided he could not do it, and told her that he wouldn't do anything to her as long as she did not testify against him. Beverly testified at trial that Quinn then drove to Walmart, hitting her in the head numerous times as he was driving. After he left the car, Beverly got out of the car and approached a Walmart employee for help. She told the employee that her son had hurt her and was trying to kill her. The Walmart employee verified this course of events and testified that Beverly was scared, but she knew who she was, where she was, and was not disoriented or confused. The Walmart employee testified that as Beverly was talking to him, a man came up to both of them, grabbed Beverly's arm and complained that she was trying to hurt him. The employee insisted that he let go and leave her alone. A surveillance video of the Walmart

parking lot corroborates this testimony, but is taken from too far a distance to identify the man's facial features. The surveillance video shows that Beverly approached the employee, a man approached them, and then the unidentified man left in a white station wagon. The employee could not identify Quinn as the person he saw and talked with in the parking lot. Beverly testified at trial that Quinn was driving her car, which she described as a tan sedan, not a white station wagon. No witness identified Quinn as the man depicted in the video in the Walmart parking lot.

{¶ 4} The detective who interviewed Beverly at Walmart testified that Beverly identified her son, James Quinn, as the person who attacked her in her home, who forced her into a car, threatened to harm her, and hit her face, causing visible injuries. The detective also testified that during his interview on the scene, Beverly was very emotional, but lucid and articulate about the events of the evening. Based on this interview, the detective obtained a search warrant. A search of Beverly's home revealed evidence that her bedroom door had been damaged as the result of being forced open.

{¶ 5} Beverly was transported to the hospital by ambulance and treated in the Emergency Room at Springfield Regional Medical Center. The paramedic who transported Beverly testified that she was alert and oriented. The ER Nurse testified that Beverly was oriented, and did not appear to suffer from dementia or any other mental defect. The ER Nurse testified that Beverly identified her son as the person who had hit and injured her.

{¶ 6} At trial, evidence of Quinn's two prior convictions for Domestic Violence was admitted through court records. Beverly acknowledged that she was the victim of one of the prior Domestic Violence convictions.

## II. The Course of Proceedings

{¶ 7}   In November 2013, Quinn was indicted on one count of Domestic Violence, a felony of the third degree, in violation of R.C. 2919.25(A). In December 2013, Quinn was indicted on two counts of Domestic Violence, felonies of the third degree, in violation of R.C. 2919.25(A); two counts of Kidnapping, felonies of the first degree, in violation of R.C 2905.01(B)(1); one count of Abduction, a felony of the third degree, in violation of R.C. 2905.02(A)(2); and one count of Intimidation, a felony of the third degree, in violation of R.C. 2921.04(B)(1).   The trial court ordered that the two indictments be consolidated and tried together.   On the day of trial, the State moved to dismiss the charge in the first indictment, and the dismissal entry was filed the day after the sentencing hearing on the convictions from the second indictment.   A jury found Quinn guilty on all counts in the second indictment. One day after the jury verdict, the trial court conducted a sentencing hearing.

{¶ 8} At the sentencing hearing, the trial court merged the two Kidnapping charges and the Abduction charge for purposes of sentencing. The State elected to proceed on count three, a charge of Kidnapping. The court denied the defense request to merge Kidnapping with the Intimidation conviction, rejecting the argument that both were committed by the same conduct.   The defendant made a statement to express his remorse, and the victim's granddaughter made a statement to explain the impact on the family. The State described Quinn's criminal history, although neither a pre-sentence investigation report, nor any other documentation, was presented to support the statements. The State urged the court to order consecutive sentences because the

offenses were committed while Quinn was under indictment and out on bond for an earlier charge of Domestic Violence against the same victim, and because consecutive sentences were necessary to protect the public and the victim.

{¶ 9} Quinn was sentenced to serve a total of twenty years in prison; three years for each of the two Domestic Violence convictions, three years for the Intimidation conviction, and eleven years for the Kidnapping conviction. The trial court ordered the sentences to run consecutively, after finding that consecutive sentences are necessary to protect the public from future crime and to punish the defendant, are not disproportionate to the seriousness of the defendant's conduct and to the danger the defendant poses to the public, are necessary to protect the public from future crime by the defendant given the defendant's history of criminal conduct, that at least two of the multiple offenses were committed as a course of conduct, that the harm caused by the offenses so committed is so great or unusual that no single prison term adequately reflects the seriousness of the defendant's conduct, and that the defendant committed one or more offenses while he was under indictment awaiting trial.

{¶ 10} Four months after the trial and conviction, Quinn filed a motion for a new trial and attached three affidavits; his own affidavit and two affidavits from his mother, Beverly, who recanted her trial testimony. The motion also requested a hearing. In the affidavits filed in support of the motion for a new trial, Beverly avers that her testimony was based on what she was told by her family and by the prosecutor. She avers that at the time of the incident, she was not wearing her glasses or hearing aid, and she was on medication that caused her confusion. She avers that she does not believe that Quinn committed the crimes against her, because she knows he had consumed two fifths of

vodka and was too drunk to stand or drive on the night of the incident. The trial court overruled the motion for a new trial without conducting a hearing. The trial court concluded:

> The defendant offered no new evidence that would create a strong possibility that a different result would occur. The victim's testimony was clearly supported by the surveillance video from Walmart, where it is clear that the victim ran from defendant's car. The Defendant is depicted on the video leaving very quickly when he sees his mother has the attention of the store clerk. The victim is the defendant's mother and it is only natural that she might change her testimony as she has done in past hearings, but the Walmart video clearly supports the victim's testimony at trial. Therefore, defendant has offered no new evidence that shows any probability that any different result would apply to the facts of this case.

## III. The Trial Court Did Not Err by Overruling the Motion for a New Trial Without Conducting a Hearing

{¶ 11} Quinn's First and Second Assignments of Error will be considered together, which assert as follows:

> THE TRIAL COURT ABUSED ITS DISCRETION DENYNG THE DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON THE BELIEF THAT THE TRIAL TESTIMONY WAS SUPPORTED BY THE SURVEILLANCE VIDEO AND WOULD NOT CREATE A STRONG PROBABILITY OF A DIFFERENT RESULT AT TRIAL

THE TRIAL COURT'S FINDINGS WERE UNSUPPORTED BY THE RECORD. THE FINDINGS THE TRIAL COURT MADE WENT TOWARD THE APPELLANT'S INNOCENCE, NOT HIS GUILT. THEREFORE, THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GRANTING THE APPELLANT A NEW TRIAL.

{¶ 12} A ruling on a motion for a new trial is within the trial court's discretion and will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Schiebel,* 55 Ohio St.3d 71, 564 N.E.2d 54 (1990); *State v. Williams,* 43 Ohio St.2d 88, 330 N.E.2d 891 (1975). "[I]t is within the trial court's discretion to determine whether or not it is necessary to hold an evidentiary hearing on a new trial motion." *State v. Moore,* 7th Dist. Mahoning No. 13 MA 9, 2014-Ohio-358, ¶ 19, citing *State v. Green,* 7th Dist. Mahoning No. 05 MA 116, 2006-Ohio-3097, ¶ 11. An abuse of discretion "implies that the court's attitude [was] unreasonable, arbitrary, or unconscionable." *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Redevelopment,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 13} In *State v. Petro,* 148 Ohio St. 505, 76 N.E.2d 370 (1947), the Supreme Court of Ohio held that "[t]o warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is

not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *Id.* at syllabus.

{¶ 14} In *Dayton v. Martin,* 43 Ohio App.3d 87, 90, 539 N.E.2d 646 (2d Dist. 1987), we concluded that "[w]hile *Petro* stands for the proposition that newly discovered evidence that merely impeaches or contradicts other evidence is not enough for a new trial, we do not read *Petro* as establishing a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result." *Accord State v. Smith*, 2d Dist. Montgomery No. 23945, 2011-Ohio-2189, ¶¶ 24-25; *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 21 (2d Dist.).

{¶ 15} When the motion for a new trial is based upon newly discovered evidence which is primarily the recantation of the prosecution's primary witness, we have held that the trial court "must make two findings: (1) which of the contradictory testimonies of the recanting witness is credible and true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?" *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 30 (2d Dist.), citing *Toledo v. Easterling,* 26 Ohio App.3d 59, 498 N.E.2d 198 (6th Dist. 1985). *Accord State v. Williams*, 2d Dist. Montgomery No. 19854, 2004-Ohio-3135.

{¶ 16} In the case before us, the trial court, without holding a hearing, determined that the trial testimony of the victim was more credible than the statements she made in

the post-trial affidavits. The trial court relied on the fact that the same witness had recanted testimony at previous hearings, but did not specify what hearings, the nature of the testimony or how the recantation affected the outcome. If the trial court was deciding credibility based on Beverly's testimony given in other cases, a different proceeding other than the trial, or on the witness's reputation for truthfulness, then an abuse of discretion occurred as a result of the trial court's consideration of matters outside of the record in this case. However, we fail to see how Beverly's lack of credibility in the past would lead to a conclusion that her testimony at trial was more credible than the post-trial affidavit.

{¶ 17} To determine which of the contradictory testimonies of a recanting witness is credible and true, a trial court must be able to point to evidentiary support in the record for its conclusion. In most cases where a motion for a new trial is based on recanted testimony of the State's primary witness, it will be necessary for the trial court to conduct a hearing to weigh the credibility of the testimony. *See, e.g., State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 21 (2d Dist.); *State v. Wright*, 67 Ohio App.3d 827, 588 N.E.2d 930 (2d Dist. 1990); *State v. Fuson*, 5th Dist. Knox No. 02CA23, 2002-Ohio-6601, ¶ 10 (evidentiary hearing on motion for new trial necessary to more accurately access the credibility of the witnesses because it is difficult to compare written and live testimony). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). In other cases, a trial court can rule on the motion for a new trial, without a hearing, when the affidavit appears

"insufficient on its face," especially when viewed "in light of the physical and medical evidence produced at trial and the circumstances surrounding the case and the alleged recantation." *State v. McConnell*, 2d Dist. Montgomery No. 24315, 2011-Ohio-5555, ¶ 19. "[T]he decision of whether a hearing is warranted upon such a motion also lies soundly with the discretion of the trial court." *State v. Butler,* 2d Dist. Clark No. 2003 CA 26, 2004-Ohio-2036, ¶ 49.

{¶ 18} In the case before us, the trial court determined that the recanted testimony would not affect the outcome of the trial because evidence of Quinn's guilt was independently established by the admission of the surveillance video. We disagree. The record establishes that no testimony was given from anyone to identify Quinn as the person in the video who made contact with Beverly and the Walmart employee. On both direct and cross-examination, the Walmart employee who talked with Beverly in the parking lot, could not identify Quinn as the person who approached him and Beverly and whom he asked to leave, as depicted in the video.  Also contrary to the trial court's finding, the record contains no testimony from anyone who positively identified the car in the video as the defendant's car. Actually, the only testimony at trial regarding what car Quinn was driving was from Beverly, who said he was driving her tan sedan, not a white station wagon as depicted in the video.  We have viewed the video, which does not reveal a clear or close enough view of the person's face to match it with Quinn. The video does not independently provide sufficient evidence to convict Quinn of any of the charged offenses.

{¶ 19} However, the record does contain sufficient support for finding that Beverly's testimony at trial was more credible than her post-trial affidavits. At trial,

evidence was presented from the officers who investigated the two separate incidents and the ER Nurse who talked with Beverly after she left Walmart. One officer testified that Beverly identified her son as the person who attacked her in her home. A detective testified that Beverly identified her son as the person who forced her into a car, threatened to harm her, and hit her face, causing visible injuries. The Walmart employee also testified that Beverly told him that her son was trying to hurt her. Although hearsay, these witnesses' testimony was properly admitted as an excited utterance, an exception to the hearsay rule under Evid. R. 803(2). In ruling on the motion for a new trial, the trial court should have considered whether the testimony of the officers, the Walmart employee, and the nurse was sufficient to support the credibility of the victim's excited utterances at the time of the offenses, even if the victim later recanted her testimony. The trial court should have also considered the testimony of the investigating officers, the Walmart employee and the medical professionals, who all testified that although Beverly was scared, she was lucid, articulate and not confused or disoriented at the time she described details of the events that had just happened to her. The mental, emotional and physical condition of a Beverly's state of mind at the time she made statements to the officers and medical professionals was properly admissible under Evid. R. 803(3).

{¶ 20} In reviewing motions for a new trial, we have applied case law established for reviewing the credibility of affidavits supporting petitions for post-conviction relief. *State v. Beavers*, 166 Ohio App.3d 605, 2006-Ohio-1128, 852 N.E.2d 754, ¶¶ 20-21 (2d Dist.). "In assessing the credibility of affidavits, the trial court should consider all relevant factors, including: '(1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or

otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.'" *State v. Calhoun*, 86 Ohio St.3d 279, 285, 714 N.E.2d 905 (1999). "One or more of the *Calhoun* factors, to the extent that any of them apply, may be sufficient to justify a conclusion that an affidavit asserting information outside the record lacks credibility." *Beavers* at ¶ 21.

**{¶ 21}** In the case before us, all of the *Calhoun* factors justify a conclusion that the affidavits filed in support of the motion for a new trial lacked credibility. The trial judge who presided over the trial is the same judge who reviewed the affidavit and determined its lack of credibility. In their post-trial affidavits, both Quinn and his mother describe his level of intoxication on the night of the offenses as "too drunk to stand." Beverly's statements regarding how much Quinn had to drink and his ability to drive on the night of the incident, if believed, had to be based on hearsay statements Quinn made to her. She also claims that her original story was derived from fear based on hearsay statements made to her by family and the prosecutor. However, the trial testimony of the officers, the Walmart employee, and the ER Nurse confirmed that the story Beverly told at trial was consistent with the statements she made to them on the night of the incident, before she talked to her other family members or the prosecutor. The affidavits were signed by Quinn's mother, who may naturally want to protect her son from long-term incarceration.

Quinn's new claim that Beverly was confused is not supported by the investigating officers or the medical professionals, who all found her oriented and articulate. Quinn's new claim that Beverly did not hear her son's voice on the night of the incident is directly contradicted by her trial testimony that he took her to a bridge and told her to jump, then said he would not hurt her if she did not testify against him. Based on the lack of Beverly's credibility in her affidavits, and the strength of her credibility at trial, as supported by the testimony of numerous witnesses, we conclude that even if the jury was presented with the new evidence there is not a strong probability that the outcome would be different.

{¶ 22} Based on the circumstances of the case before us, we conclude that the trial court did not err by not conducting a hearing on the motion for a new trial, or by overruling the motion for a new trial. Therefore, Quinn's First and Second Assignment of Errors are overruled.

## IV. Conclusion

{¶ 23} Both assignments of error having been overruled, the order of the trial court overruling Quinn's motion for a new trial is Affirmed.

. . . . . . . . . . . . .

DONOVAN, J., and WELBAUM, J., concur.


Copies mailed to:

Ryan A. Saunders
Lucas W. Wilder
Hon. Douglas M. Rastatter