[Cite as *State v. Lauderdale*, 2024-Ohio-481.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29753 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 02569 |
| | : | |
| DELESHAWN LAUDERDALE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 9, 2024

. . . . . . . . . . .

MEGAN M. PATITUCE and JOSEPH C. PATITUCE, Attorneys for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Deleshawn Lauderdale, appeals from his convictions for rape and gross sexual imposition following a jury trial in the Montgomery County Court of Common Pleas.   In support of his appeal, Lauderdale contends that his conviction for gross sexual

imposition was not supported by sufficient evidence. Lauderdale also contends that the trial court committed plain error by failing to give a curative jury instruction at trial after Lauderdale's mother engaged in disruptive behavior in the gallery and after the victim had an emotional outburst while testifying. In addition, Lauderdale claims that his trial counsel provided ineffective assistance by failing to move for a mistrial or, alternatively, a curative jury instruction, after the jury had observed the disruptive behavior of Lauderdale's mother and the victim's emotional outburst. Lauderdale further claims that the State engaged in prosecutorial misconduct by referring to the victim's emotional outburst during its closing argument. Lastly, Lauderdale claims that the trial court abused its discretion by overruling his post-verdict motion for new trial without holding a hearing or reviewing the medical records that were at issue in the motion. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On September 22, 2022, a Montgomery County grand jury returned an indictment charging Lauderdale with one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree. The charges stemmed from allegations that on May 19, 2022, Lauderdale, who had just turned 18 years old, forced his cousin's 16-year-old daughter, F.W., to have vaginal intercourse with him. It was also alleged that Lauderdale touched F.W.'s breast.

{¶ 3} Lauderdale pled not guilty to the indicted charges and the matter proceeded

to a jury trial.   At trial, the State called several witnesses, including F.W., F.W.'s mother, and the officers who investigated the matter.   The State also called a social worker who had interviewed F.W., a sexual assault nurse examiner ("SANE nurse") who had examined F.W., and a DNA analyst who had analyzed swabs taken from F.W.   In addition, the State called a digital forensic examiner who had extracted data from F.W.'s cell phone.   Lauderdale also testified in his defense.   The following is a summary of the testimony and evidence that was presented at trial.

*Lauderdale's Relationship with F.W.*

{¶ 4} Lauderdale and F.W.'s mother ("Mother") are first cousins.   In May 2022, Lauderdale began staying with Mother and her six children at Mother's Dayton residence in Montgomery County, Ohio.   F.W. is the oldest of Mother's six children.   F.W. is close in age to Lauderdale and has known Lauderdale all her life.   Before the alleged sexual assault, F.W. and Lauderdale were like best friends and spent a lot of time together. However, F.W. denied engaging in any type of sexual activity with Lauderdale before the alleged sexual assault.   Lauderdale, on the other hand, claimed that he and F.W. had previously engaged in some flirtations.   Specifically, Lauderdale claimed that he had digitally penetrated F.W. and that F.W. had grinded on his private area while they were at a friend's house.

*The Alleged Sexual Assault*

{¶ 5} On the night of May 18, 2022, F.W. slept in Mother's bed with her five-year-

old brother, her ten-year-old brother, and Lauderdale. F.W. claimed that they had fallen asleep while watching television. During that time, Mother was at home sleeping on the couch, but she left early the next morning for her nursing school program.

{¶ 6} F.W., who fell asleep wearing a tan zipper jacket and jean shorts, woke up in the middle of the night after she had felt someone rubbing between her legs. When she woke up, she noticed that her breast was hanging out of her bra and jacket, which had been unzipped. F.W. then looked around and observed that everyone in the room appeared to be sleeping. Thereafter, F.W. put her breast back inside her bra, zipped up her jacket, and went back to sleep beside her five-year-old brother.

{¶ 7} Later the same night, F.W. woke up a second time as a result of being moved and feeling someone groping her. Specifically, F.W. felt someone grabbing her buttocks area and moving her in a position that left her face-to-face with Lauderdale. When F.W. looked around, she observed that everyone still appeared to be sleeping. F.W. then moved back over by her brother and went to sleep.

{¶ 8} F.W. woke up a third time to find her jean shorts down by her ankles and Lauderdale having sex with her. F.W. specifically testified that Lauderdale had his penis inside her vagina while she was lying on her side with Lauderdale's chest facing her back. F.W. also testified that Lauderdale pushed her head down when she looked back at him. F.W. then told Lauderdale that she had to use the bathroom. After urinating, F.W. immediately left the house and walked to the corner of the street, where she called her Mother's friend, Mikkel, for help.

{¶ 9} Mikkel picked up F.W. and took her to a friend's house. Mikkel was

eventually able to contact Mother and advise her of the situation. Mother left her nursing program after speaking with Mikkel and went home to confront Lauderdale. Mother recalled that when she accused Lauderdale of sexually assaulting F.W., Lauderdale nonchalantly acted as if he did not know what she was talking about and denied any wrongdoing. Mother called the police and then went to pick up F.W. at her friend's house, where she observed F.W. distraught and crying.

*The Investigation*

{¶ 10} After calling the police, Mother also flagged down a police cruiser in the street and advised the officer that a rapist was at her house. The officer immediately went to Mother's residence and contacted Lauderdale. The officer was wearing a body camera that captured his interaction with Lauderdale. The first six minutes and seventeen seconds of the body camera recording was admitted into evidence as State's Exhibit 21. On the recording, the officer can be seen approaching Lauderdale in Mother's garage and asking him: "What's going on, man?" In response, Lauderdale told the officer:

> [F.W.] woke me up going to bathroom. I turned to the other side. I, uh, ended up waking up grabbing my computer, ok. She saying I touched her uh like physically or whatever I don't know.

State's Ex. 21.

{¶ 11} For purposes of officer safety, the officer asked Lauderdale if he had any guns or knives; Lauderdale said he had none. The officer then told Lauderdale that he

was going to be detained while the sexual assault allegations were investigated. Thereafter, the officer took Lauderdale to his police cruiser and obtained Lauderdale's identification information. During that time, Lauderdale advised the officer that he had been staying at Mother's residence for the past two days. The officer testified, and the body camera video confirmed, that the officer did not ask Lauderdale any investigative questions. After Lauderdale was detained, the matter was turned over to detectives with the Dayton Police Department, who interviewed Lauderdale at the department's Safety Building.

{¶ 12} Lauderdale's interview with the detectives was video recorded and admitted into evidence as State's Exhibit 25. During the interview, Lauderdale confirmed that he and F.W. were each other's favorite cousin. Lauderdale also confirmed that he and F.W. had been sleeping in the same bed for the past two nights. However, Lauderdale initially denied engaging in any type of sexual activity with F.W.

{¶ 13} After Lauderdale denied engaging in sexual activity with F.W., the detectives advised Lauderdale that DNA testing would be performed during the investigation. The detectives explained to Lauderdale that the DNA testing could prove that something had happened between him and F.W. and that it would be better if Lauderdale just told them what had happened. Lauderdale continued to claim that he never had sex with F.W. and voluntarily gave his DNA sample for testing.

{¶ 14} After obtaining Lauderdale's DNA sample, the detectives began to use an investigative tactic whereby they minimized the situation. For example, the detectives suggested that F.W. had probably come on to Lauderdale and that Lauderdale was too

embarrassed to talk about the situation. After this discussion, Lauderdale changed his story and told the detectives that, over the past couple of years, he and F.W. had had a few flirtations. Lauderdale claimed that F.W. had grinded on his private area at a friend's house and that he had digitally penetrated F.W. Concerning the night in question, Lauderdale told the detectives that he had licked F.W.'s breast and engaged in consensual vaginal sex with F.W.

{¶ 15} While the investigation was pending, Mother took F.W. to Dayton Children's Hospital to be examined. Before F.W. was examined, a social worker at the hospital spoke with F.W. to assess her physical and medical needs. Based on that conversation, the social worker recommended that F.W. undergo a sexual assault nurse examination ("SANE exam"). The social worker testified that F.W. had a very quiet, sad, and solemn demeanor during their conversation.

{¶ 16} After F.W. spoke with the social worker, a SANE nurse examined F.W. During the examination, the SANE nurse photographed F.W.'s genitals and took swabs of F.W.'s mouth, tongue, fingernails, vagina, and anus. The nurse also swabbed an area of F.W.'s hand where F.W. claimed that Lauderdale had kissed or licked her. The swabs were sent to the Ohio Bureau of Criminal Investigation ("BCI") for analysis.

{¶ 17} A forensic DNA analyst from BCI analyzed F.W.'s vaginal swabs and determined that the swabs tested positive for semen. The analyst also determined that there were two DNA contributors on the vaginal swabs. The first DNA contributor was F.W., which was expected since the swabs were taken from F.W.'s vagina. The second DNA contributor, i.e., the sperm cell contributor, was Lauderdale. Accordingly, the DNA

evidence established that Lauderdale's semen was present inside F.W.'s vagina.

{¶ 18} Later in the investigation, Mother advised the investigating detectives that she had a security camera in her bedroom that constantly detects motion. Mother told the detectives that she had noticed the camera had been unplugged for a five-hour period on the day of the sexual assault. Mother provided the detectives with a screenshot video of the cell phone application that was connected to the security camera in question. The screenshot video showed that the camera did not detect any motion between 6:18 a.m. and 11:24 a.m. on May 19, 2022. Mother testified that 6:18 a.m. was right after she had left for nursing school. Mother also testified that she did not keep the camera pointed toward her bed, but toward the ceiling. The screenshot video was admitted into evidence as State's Exhibit 20.

{¶ 19} Mother also gave the investigating detectives consent to search F.W.'s cell phone. After receiving said consent, the lead detective asked a digital forensic examiner from the Montgomery County Sheriff's Office to extract data from F.W.'s phone. The extracted data established that Lauderdale and F.W. had exchanged text messages over Instagram on the afternoon of May 19, 2022. F.W. testified that she had received the messages from Lauderdale while she was at her mother's friend's house. The messages were admitted into evidence as State's Exhibit 23 and stated, in relevant part, the following:

> *5/19/2022 11:55:05 AM* -**Lauderdale:** [A]ye what u talking bout?
>
> *5/19/2022 11:55:51 AM* -**F.W.:** [You know] what you did there is no reason to lie now
>
> *5/19/2022 11:56:34 AM* -**Lauderdale:** [L]ie about what. [All i know] is yo cousin

|  |  |  | or whatever talking bout touch |
|---|---|---|---|
| *5/19/2022 11:57: 35 AM* | - **Lauderdale:** | | [T]he only time i touched u THROUGHOUT the night was to put eli closer to u lil bru kept tryna get in my lil cover. |
| *5/19/2022 11:57:36 AM* | -**F.W.:** | | Listen stop tryna play stupid [please] ain't [nobody] gone lie like that |
| *5/19/2022 11:58:19 AM* | -**Lauderdale:** | | [S]tupid on what im geuniley (sic) confused u woke me going to the bathroom/ |

State's Ex. 23.

*Heckling by Lauderdale's Mother and F.W.'s Emotional Outburst at Trial*

{¶ 20} After Mother testified at trial, Lauderdale's counsel advised the trial court that there had been a "pretty big reaction" in the gallery that was noticed by some of the jurors. Trial Tr. Vol. I, p. 131. Lauderdale's counsel suggested that, once the jury left the courtroom, the judge should remind the gallery not to react to the testimony. The record does not indicate whether the judge gave any such instruction to the gallery.

{¶ 21} The record thereafter indicates that during F.W.'s cross-examination, a member of the gallery, later identified as Lauderdale's mother, began to audibly heckle and make faces, motions, and gestures at F.W. In response, F.W. blurted out: "Yeah, cause I'm trying to figure out what's funny." Trial Tr. Vol. I, p. 160. Following F.W.'s outburst, counsel had a sidebar. During the sidebar, the State asked the trial court to eject Lauderdale's mother from the courtroom; Lauderdale's counsel, on the other hand, requested that Lauderdale's mother simply be given an advisement. In response, the

trial court instructed Lauderdale's counsel to lean over and quietly advise his client's mother to stop being disruptive.

**{¶ 22}** After making the advisement, Lauderdale's counsel continued to cross-examine F.W. During the continued cross-examination, Lauderdale's counsel asked F.W. if she was embarrassed about having sex with her cousin. The State objected to the question and the objection was sustained. F.W., however, became upset by the question and responded as follows:

| | |
|---|---|
| F.W.: | What. Are you serious? |
| THE COURT: | Order. |
| F.W.: | Are you serious? |
| THE COURT: | Ma 'am sit down. |
| F.W.: | Am I embarrassed? |
| THE COURT: | Sit down. |
| F.W.: | I didn't have sex with him. He raped me. That's what happened. |
| THE COURT: | Ma'am, sit down. |
| F.W.: | And I don't get what's funny. |
| THE COURT: | Ma'am – you just – |
| F.W.: | What's funny – |
| THE COURT: | -- there's no questions. |
| F.W.: | -- that your son raped me? |
| THE BAILIFF: | Have a seat. |

THE STATE:      Ma'am.

F.W.:      No, I'm not going to have a seat.   I'm angry.

THE BAILIFF:      I get it, but you have to.

F.W.:      For months –

THE COURT:      There's no questions.

F.W.:      -- for months I've been dealing with this.

THE COURT:      No questions.   Remain silent until there's a question.

THE COURT:      Let's take a recess.   * * *

Trial Tr. Vol. I, p. 164-165.

{¶ 23} After the trial court ordered a recess, the jury left the courtroom and the trial court made the following statement on the record:

There was some disruptive behavior, activity during the examination of the witness, [F.W.].   The Court has discussed this situation with counsel off the record.   I think the record does reflect that the witness became emotional, vocal, yelled.   There may have been some cause of that or partially caused by behavior of a spectator.   And the court is concerned about the behavior of that spectator that who I believe is a family member of the Defendant.   Of course, in this case related to the complaining witness.

So there would be – been a previous indication by the Court to have to warn her.   Defense counsel did that.   And then there was some

behavior on her part that contributed toward the emotional outburst of the complaining witness. So the Court is going to, during the testimony of [F.W.], which we have some more examination to take place. We're going to not admit the spectator so as to not disrupt the proceedings.

I think one has to behave very well during – when in court. Cannot do anything that disrupts the proceedings, impedes the proceedings, inflames a witness, intimidates a witness. To eliminate that potential, we're going to have the spectator remain outside the courtroom during the testimony of this witness. Is there anything further that counsel would like to indicate for the record? * * *

Trial Tr. Vol. I., p. 165-166.

{¶ 24} Following the trial court's statement, neither party objected to how the trial court handled the matter. The State thereafter conducted a redirect examination of F.W. and called the remainder of its witnesses.

*Lauderdale's Version of Events*

{¶ 25} After the State rested its case, Lauderdale testified in his defense. Regarding the incident in question, Lauderdale testified that he had kissed F.W.'s neck to her breasts and grabbed her leg. Lauderdale also testified that F.W. had unbuckled her jean shorts and helped him pull them off. Lauderdale testified that F.W. then turned around and allowed him to put his penis inside her vagina while he was lifting one of her legs. Accordingly, Lauderdale claimed that he and F.W. had engaged in consensual

vaginal intercourse. Lauderdale testified that he initially lied about his sexual activity with F.W. because he was scared and embarrassed.

*Verdict, Motion for New Trial, and Sentencing*

{¶ 26} After the defense rested its case and after closing arguments, the jury deliberated and found Lauderdale guilty as charged in the indictment. Prior to sentencing, Lauderdale filed a Crim.R. 33 motion for new trial. In the motion, Lauderdale argued that a new trial was warranted based on newly discovered evidence. The newly discovered evidence at issue was hundreds of medical records from Dayton Children's Hospital that pertained to F.W. There is no dispute that the State sent the medical records to Lauderdale's counsel approximately two and a half weeks after trial. Lauderdale claimed that the inability to inspect the medical records prior to trial prejudiced his substantial rights.

{¶ 27} In response to Lauderdale's motion for new trial, the State claimed that it did not receive the medical records at issue until after the jury had reached its verdict. In support of this claim, the State pointed out that the United States Postal Service time stamp on the records was dated January 23, 2023, i.e., four days after trial, and that the records show that they were printed on January 20, 2023, i.e., one day after trial. The State also claimed that it had forwarded the records to Lauderdale immediately after realizing the records had arrived. The State further claimed that the medical records were either immaterial or duplicative of medical records that had been provided to the defense in advance of trial.

{¶ 28} On February 21, 2023, the trial court addressed Lauderdale's motion for new trial at the start of his sentencing hearing.   In doing so, the trial court overruled the motion on grounds that the medial records in question were not "really relevant or material to the issues at trial."   Trial Tr. Vol. II, p. 327.

{¶ 29} After overruling Lauderdale's motion for new trial, the trial court sentenced Lauderdale to a mandatory, indefinite term of four to six years in prison for rape and 18 months in prison for gross sexual imposition.   The trial court ordered the two prison terms to run concurrently, for a total indefinite term of four to six years in prison. The trial court also designated Lauderdale a Tier III sex offender.

{¶ 30} Lauderdale now appeals from his conviction, raising five assignments of error for review.   For purposes of clarity, we will review the assignments of error out of order.

**Fourth Assignment of Error**

{¶ 31} Under his fourth assignment of error, Lauderdale contends that his conviction for gross sexual imposition under R.C. 2907.05(A)(1) was not supported by sufficient evidence.

{¶ 32} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).   "When reviewing a claim as to sufficiency of evidence, the relevant

inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 33} As previously discussed, Lauderdale contends that the State failed to present sufficient evidence establishing that he had committed the offense of gross sexual imposition in violation of R.C. 2907.05(A)(1). That offense is committed when the offender has "sexual contact with another, not the spouse of the offender," and the offender "purposely compel[led] the other person * * * to submit by force or threat of force." R.C. 2907.05(A)(1).

{¶ 34} "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 35} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Accordingly, " '[f]orce' is satisfied by 'any effort physically exerted.' " *State v. Johnson*, 2d Dist. Montgomery No. 26961, 2017-Ohio-5498, ¶ 21, quoting *State v. Snyder*, 192 Ohio App.3d 55, 2011-Ohio-175, 947 N.E.2d 1281, ¶ 18 (9th Dist.). It is well established that "the manipulation of a sleeping victim's clothing in order to facilitate sexual conduct

constitutes force under R.C. 2901.01(A)(1) even though such force requires only minimal physical exertion." *State v. Walker*, 8th Dist. Cuyahoga No. 96662, 2011-Ohio-6645, ¶ 20, citing *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 17. (Other citations omitted.) *Accord State v. Johnson,* 2d Dist. Greene No. 2009-CA-38, 2010-Ohio-2920, ¶ 18. *See also State v. Burton*, 4th Dist. Gallia No. 05CA3, 2007-Ohio-1660, ¶ 38 ("[w]hen the circumstances include a victim who is initially asleep when the sexual conduct begins, the state may satisfy its burden with evidence of only the minimal force required to manipulate the victim's body or clothing to facilitate the assault"); *State v. H.H.*, 10th Dist. Franklin No. 10AP-1126, 2011-Ohio-6660, ¶ 12 ("moving [the victim's] body and removing her clothes while she slept would constitute force").

{¶ 36} In this case, the parties stipulated that Lauderdale and F.W. were not spouses. F.W. testified that the first time she woke up on the night in question, she had felt someone rubbing between her legs and noticed that her breast was hanging out of her bra and jacket, which had been unzipped. F.W. also testified that she woke up a second time as a result of being moved and feeling someone groping her. On cross-examination, F.W. clarified that she had felt someone grabbing her buttocks area and moving her in a position that had left her face-to-face with Lauderdale. Thereafter, F.W. testified that she woke up a third time to Lauderdale engaging in non-consensual vaginal intercourse with her.

{¶ 37} F.W.'s testimony regarding the vaginal intercourse pertains to Lauderdale's rape conviction, which Lauderdale has not challenged on sufficiency grounds. As previously discussed, Lauderdale is only challenging the sufficiency of the evidence

regarding his conviction for gross sexual imposition. Lauderdale claims that his conviction for gross sexual imposition was not supported by sufficient evidence because F.W. testified that everyone was asleep when she noticed her breast was out, and because no witness, including F.W., observed Lauderdale removing F.W.'s breast from her jacket and bra. This argument, however, fails to account for the strong circumstantial evidence presented at trial.

**{¶ 38}** " 'Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.' " *State v. Lambert*, 2d Dist. Montgomery No. 28655, 2021-Ohio-17, ¶ 28, quoting *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Circumstantial evidence has the same probative value as direct evidence." (Citations omitted.) *State v. Phifer*, 2d Dist. Clark No. 2020-CA-13, 2021-Ohio-521, ¶ 23. "In fact, in some cases, 'circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence.' " *Id.*, quoting *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

**{¶ 39}** Here, the evidence established that the only other individuals in bed with F.W. and Lauderdale were F.W.'s two younger brothers, who were five and ten years old. The evidence also established that after F.W. put her breast back into her jacket, and after she had felt someone rub between her legs and grope her buttocks, she later woke up to Lauderdale raping her. From this evidence, the jury could have reasonably inferred that Lauderdale was the individual who had removed F.W.'s breast from her jacket and bra and was the individual who had rubbed between her legs and groped her buttocks.

{¶ 40} Because breasts, buttocks, and thighs are considered "erogenous zones," and because the evidence established that Lauderdale ended up raping F.W. through vaginal intercourse after touching those areas of F.W.'s body, a rational factfinder could have concluded that Lauderdale had touched those areas for purposes of sexual arousal, and therefore engaged in sexual contact as defined in R.C. 2907.01(B). A rational factfinder could have also reasonably concluded that the sexual contact was made by force since F.W.'s testimony indicated that Lauderdale had facilitated the offense by manipulating F.W.'s clothes and body while she was sleeping.

{¶ 41} For the foregoing reasons, we find that when the evidence is viewed in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that all elements of gross sexual imposition were satisfied. Accordingly, Lauderdale's conviction for gross sexual imposition was supported by sufficient evidence.

{¶ 42} Lauderdale's fourth assignment of error is overruled.

## Second Assignment of Error

{¶ 43} Under his second assignment of error, Lauderdale contends that the trial court committed plain error by failing to sua sponte give a curative jury instruction following F.W.'s emotional outburst at trial. According to Lauderdale, the trial court should have instructed the jury to disregard the disruptive behavior of Lauderdale's mother and F.W.'s subsequent emotional outburst. Lauderdale also claims that the trial court committed plain error by failing to strike the non-responsive statements made by

F.W. during her emotional outburst.

{¶ 44} The record establishes that Lauderdale's trial counsel never requested a curative jury instruction or objected to its omission. Lauderdale's trial counsel also never requested that the trial court strike the non-responsive statements made by F.W. during her emotional outburst. As such, we must review the instant assignment of error under a plain error analysis. *See State v. Cunningham*, 4th Dist. Ross No. 19CA3698, 2021-Ohio-416, ¶ 50 ("the failure to request a curative instruction at trial forfeits all but plain error on appeal"); *State v. Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372, ¶ 22 (2d Dist.) ("[o]rdinarily, a failure to bring an error to the attention of the trial court at a time when the court could correct that error constitutes a waiver of all but plain error"), citing *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990).

{¶ 45} Crim.R. 52(B) provides appellate courts with discretion to correct "[p]lain errors or defects affecting substantial rights." Crim.R. 52(B). "In order for plain error to exist, there must be an obvious defect in the trial proceedings that affected the defendant's substantial rights, meaning that the trial court's error must have affected the outcome of the trial." *State v. Petticrew*, 2d Dist. Clark No. 2022-CA-29, 2023-Ohio-159, ¶ 18, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. The question, therefore, "is whether, but for the error, the outcome of the proceedings clearly would have been otherwise." (Emphasis omitted.) *State v. Hornbeck*, 155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978). "Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest

miscarriage of justice." *Id.*

**{¶ 46}** In this case, we cannot say that the outcome of Lauderdale's trial clearly would have been otherwise had the trial court given a curative jury instruction and/or stricken the non-responsive statements made by F.W. during her emotional outburst. Although F.W.'s non-responsive statements were emotionally charged, they were consistent with her trial testimony and did not add any new facts that would have changed the outcome of the trial. Although the disruptive conduct of Lauderdale's mother and F.W.'s emotional outburst could have caused jurors to sympathize with F.W., we cannot say that any such sympathy was the tipping point in this case, as the State presented a significant amount of evidence against Lauderdale. For example, the forensic DNA evidence established that Lauderdale's semen was present on F.W.'s vaginal swabs. The evidence also indicated that the security camera in Mother's bedroom had been rendered inoperable around the time of the alleged rape. The evidence also established that Lauderdale had lied multiple times to multiple individuals during the investigation. Specifically, Lauderdale's recorded interview with the investigating detectives established that Lauderdale changed his story to his having had consensual sex with F.W. only after the detectives deployed their minimization tactics and advised Lauderdale that DNA testing would be performed.

**{¶ 47}** F.W., on the other hand, made consistent, unwavering allegations of rape against Lauderdale and even confronted Lauderdale about the incident via messages on Instagram. It was also significant that both F.W. and Lauderdale testified that they had been each other's favorite cousin and that F.W. had thought of Lauderdale as a best

friend. The evidence of their close relationship established that F.W. had nothing to gain by going through the uncomfortable process of accusing her favorite cousin of rape—a process that required her to undergo an invasive SANE exam and to recount the traumatic, embarrassing experience multiple times to various individuals, including the jury.

{¶ 48} Based on all this evidence, it is likely that the jury would have found Lauderdale guilty of the charged offenses even if the trial court had given a curative jury instruction regarding the disruptive behavior of Lauderdale's mother and F.W.'s emotional outburst and even if it had stricken F.W.'s non-responsive statements. Accordingly, Lauderdale cannot establish that the trial court's failure to do so constituted plain error.

{¶ 49} Lauderdale's second assignment of error is overruled.

**First Assignment of Error**

{¶ 50} Under his first assignment of error, Lauderdale contends that his trial counsel provided ineffective assistance by failing to move for a mistrial or, in the alternative, a curative jury instruction, after the jury observed the disruptive behavior of Lauderdale's mother and F.W.'s emotional outburst.

{¶ 51} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which was adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, a defendant must show that his trial

counsel rendered deficient performance and that his counsel's deficient performance prejudiced the defense. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 52} To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 29, citing *Strickland*.

{¶ 53} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 54} In reviewing ineffective assistance claims, this court "will not second-guess trial strategy decisions[.]" *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998), citing *Strickland* at 689, 104 S.Ct. 2052. Therefore, " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-

CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

{¶ 55} In this case, the decision of Lauderdale's trial counsel to not request a mistrial or a curative jury instruction was a matter of trial strategy. *See State v. Jenkins*, 2d Dist. Miami No. 2000-CA-59, 2001 WL 848582, *6 (July 27, 2001) (holding that trial counsel's decision not to request a mistrial or curative jury instruction "involved matters of trial tactics, on which trial counsel's decisions must be given broad deference"); *State v. Zeune*, 10th Dist. Franklin No. 10AP-1102, 2011-Ohio-5170, ¶ 37, ("[t]he decision not to request a mistrial is one of trial strategy best left to trial counsel"), citing *State v. Seiber*, 56 Ohio St.3d 4, 12, 564 N.E.2d 408 (1990). Lauderdale's trial counsel may have believed that F.W.'s outburst made her look less credible in the eyes of the jury and may have wanted the jury to consider the outburst during deliberations. This notion is supported by the fact that Lauderdale's trial counsel referenced F.W.'s outburst during closing argument. Specifically, counsel stated that F.W. "behave[d] badly and poorly on the stand" in response to an "uncomfortable truth[.]" Trial Tr. Vol. II, p. 298. Therefore, counsel's decision not to request a mistrial or a curative jury instruction was a tactical one that will not be second-guessed by this court. Because that decision was a matter of trial strategy, it cannot form the basis of an ineffective assistance claim.

{¶ 56} Furthermore, Lauderdale cannot establish that he was prejudiced by his trial

counsel's failure to move for a mistrial, because it is pure speculation whether the trial court would have granted Lauderdale a mistrial had one been requested. " 'Such speculation is insufficient to establish ineffective assistance.' " *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119, quoting *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217. (Other citations omitted.)

**{¶ 57}** Lauderdale also cannot establish that he was prejudiced by his trial counsel's failure to request a curative jury instruction. Given the significant amount of evidence that was presented against Lauderdale at trial, there is not a reasonable probability that a curative instruction would have changed the jury's verdict. Because Lauderdale failed to establish deficient performance and prejudice, his ineffective assistance of counsel claim fails.

**{¶ 58}** Lauderdale's first assignment of error is overruled.

### Third Assignment of Error

**{¶ 59}** Under his third assignment of error, Lauderdale contends that the State committed prosecutorial misconduct when it referenced F.W.'s outburst during its closing argument.

**{¶ 60}** "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Garrett*, 171 Ohio St.3d 139,

2022-Ohio-4218, 216 N.E.3d 569, ¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994).

{¶ 61} We note that prosecutors are afforded wide latitude in the presentation of their closing arguments. *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 126; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). They may comment freely on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *Lott* at 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). *Accord State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19 (2d Dist.). "Both parties * * * may be 'colorful or creative' [during closing arguments] but not purely abusive, inflammatory, or purely derogatory." *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 96, quoting *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988).

{¶ 62} In this case, Lauderdale claims that the State engaged in prosecutorial misconduct during its closing argument when it made the following statements that referenced F.W.'s emotional outburst on the witness stand:

1. "[F.W.] had no idea when her cousin moved in with her just a few days prior to that that she would end up eight months later on a witness stand telling strangers about the worst thing that ever

happened to her. That she would be berated and bullied. That she would have to come to the point where she was yelling because she was adamant about what had happened to her." Trial Tr. Vol. II, p. 292.

2. "Unlike this Defendant, her story was the same all the way through * * * And she yelled it from that witness stand when she was so frustrated because she had been repeatedly berated about her story." *Id.*

3. "And then if that wasn't enough, she'd be forced to shout it because the person she has to make believe—she was being attacked." *Id.* at 297.

4. "You know, there's a term that's been thrown around quite a bit lately, gaslighting. I never really quite understood what that meant * * * But it clicked yesterday when [F.W.] was up there screaming about what happened to her because she was being manipulated into believing that her own reality was not what happened, because she was sitting there knowing that she knew what happened and knowing that this Defendant knew what happened. And she just couldn't quite understand why she had to scream it." *Id.*

**{¶ 63}** The record establishes that Lauderdale did not object to any of the foregoing comments at trial. As a result, the comments may only be reviewed for plain error. *State v. Miller*, 2d Dist. Clark No. 2022-CA-58, 2023-Ohio-2508, ¶ 69. "Again, to prevail

on plain-error review, it must be established that, but for the misconduct in question, the outcome of trial would have been clearly different." *Id.* at ¶ 70, citing *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 111. In the context of a claim of prosecutorial misconduct, the alleged misconduct "constitutes plain error only if it is clear that [the defendant] would not have been convicted in the absence of the improper comments." (Citations omitted.) *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist.1996).

{¶ 64} Upon review, we cannot say that it is clear that Lauderdale would not have been convicted absent the comments at issue. As previously discussed, there was a significant amount of evidence presented at trial supporting Lauderdale's convictions. Because it is not clear that the outcome of Lauderdale's trial would have been different absent the alleged improper comments, the plain error standard has not been satisfied.

{¶ 65} Lauderdale's third assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 66} Under his fifth assignment of error, Lauderdale contends that the trial court erred by overruling his post-verdict motion for new trial without holding a hearing and without reviewing the medical records at issue in the motion.

{¶ 67} Crim.R. 33(A)(6) provides that a motion for new trial may be granted "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." To grant a properly filed motion under this rule, the trial court must find, among other things, that the newly-

discovered evidence "discloses a strong probability that it will change the result if a new trial is granted" and is "material to the issues[.]" *State v. Quinn*, 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, ¶ 13, quoting *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶ 68} "The defendant is entitled to an evidentiary hearing [on a motion for new trial] when the allegations in the motion demonstrate substantive grounds for relief." (Citation omitted.) *State v. Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, ¶ 28. Whether an evidentiary hearing is warranted is within the sound discretion of the trial court. *State v. Moore*, 2d Dist. Clark No. 2017-CA-49, 2018-Ohio-318, ¶ 14. Accordingly, we review a trial court's decision on a Crim.R. 33 motion for an abuse of discretion. *State v. Matthews*, 81 Ohio St.3d 375, 378, 691 N.E.2d 1041 (1998); *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 23.

{¶ 69} "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is arbitrary if it is made ' "without consideration of or regard for facts [or] circumstances." ' " *State v. Hill*, 171 Ohio St.3d 524, 2022-Ohio-4544, 218 N.E.3d 891, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d 474, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). "A decision is unconscionable if it 'affronts the sense of justice, decency, or reasonableness.' " *State*

*v. Harris*, 2023-Ohio-3994, __ N.E.3d __, ¶ 72 (10th Dist.), quoting *Fernando v. Fernando*, 2017-Ohio-9323, 102 N.E.3d 657, ¶ 7 (10th Dist.).

**{¶ 70}** We note that Lauderdale references *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in his appellate brief even though his motion for new trial did not allege a *Brady* violation. This is pertinent because when a *Brady* violation is alleged within the framework of a Crim.R. 33(A)(6) motion for new trial, a de-novo-due-process review applies as opposed to an abuse-of-discretion review. *See State v. Smith*, 2d Dist. Montgomery No. 27853, 2018-Ohio-4691, ¶ 24-25. Lauderdale, however, asserts in his appellate brief that an abuse-of-discretion review applies to the trial court's decision overruling his motion for new trial. Because Lauderdale's motion for new trial did not allege a *Brady* violation, we agree that an abuse-of-discretion review is appropriate.

**{¶ 71}** As previously discussed, Lauderdale's motion for new trial was based on newly discovered medical records pertaining to F.W. There is no dispute that the State provided the medical records at issue to the defense two and a half weeks after Lauderdale's trial. The trial court overruled Lauderdale's motion for new trial without a hearing on grounds that the medical records were not "relevant or material to the issues at trial." Trial Tr. Vol. II, p. 327. The trial court also found that the State had provided all relevant and material medical records to the defense prior to trial.

**{¶ 72}** Lauderdale contends that the trial court's decision overruling his motion for new trial was an abuse of discretion because the trial court did not hold a hearing on his motion or review the medical records in question. The record establishes that, when

overruling the motion, the trial court relied solely on the arguments raised in Lauderdale's motion and the State's opposing memorandum. We find it significant that Lauderdale did not provide the trial court with any of the medical records at issue. In addition, Lauderdale did not specify what information in the medical records was material to the issues raised during his trial or how the information in the medical records would have changed the outcome of his trial. Instead, Lauderdale simply made a blanket, unsupported allegation of prejudice in his motion. Because of this, Lauderdale failed to provide the trial court with "substantive grounds for relief" to warrant a hearing on his motion or a review of the medical records. Accordingly, we find that the trial court's decision overruling Lauderdale's motion for new trial was reasonable and not an abuse of discretion.

{¶ 73} Lauderdale's fifth assignment of error is overruled.


### Conclusion

{¶ 74} Having overruled all assignments of error raised by Lauderdale, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


LEWIS, J. and HUFFMAN, J., concur.